IN THE MATTER OF HENRY J. RIDGELY, ESQUIRE.

(*June* 29, 1954.)

SOUTHERLAND, C. J., and WOLCOTT and TUNNELL, J. J., sitting.

*S. Samuel Arsht* for the Censor Committee.

*William Prickett* for Henry J. Ridgely.

Supreme Court of the State of Delaware, No. 19, 1954.

SOUTHERLAND, C. J.:

There is before us for review under Supreme Court Rule 32, *Del. C. Ann.*, a report of the Censor Committee of the Court recommending disciplinary action against Henry J. Ridgely, a member of the bar and until recently Deputy Attorney General for Kent County. Two cases of alleged unprofessional conduct form the basis of the Committee's action. Both of them involve the important and delicate question of the representation of conflicting interests by an attorney who occupies the office of a Deputy Attorney General and who is also engaged in private practice.

### 1. The *Villa* Case.

The primary facts were found by the Committee and appear to be undisputed. The following statement for the most part is based on these findings, supplemented by the Court's examination of the record.

On May 23, 1953, Lieutenant Charles Villa, an Air Force Pilot stationed at the Dover Air Force Base, bought a Mercury

automobile from Biter's Auto Service, Inc., automobile dealers in Dover. The total consideration was $3,123.04, made up as follows:

Trade-in allowance for Ford car ............................. $1,745.60

Note to finance company secured by conditional
    sales contract .................................................. 1,000.00

Personal Note .................................................... 357.44

Cash ................................................................. 20.00

Villa believed he was buying a new 1953 Mercury. The price was that fixed for a new car. The purchase order signed by him and accepted by Edward P. Biter, President of the corporation, specified a new car. In fact, the car was not new. As Biter and the salesman knew, it was a used car. It had been driven about 800 miles, had been involved in an accident, and had been traded in to Biter's by the prior owner. The speedometer had been turned back (by whom, does not appear) to show only eight miles of driving.

By chance Villa learned the facts a few days later. Incensed, he consulted Lieutenant H. M. Finkelstein, then Assistant Staff Judge Advocate, at the Air Base, who told him to see Ridgely, the Deputy Attorney General. Finkelstein then called Ridgely on the telephone, stated the facts, and expressed his opinion that a violation of the criminal law was involved. Ridgely told Finkelstein to have Villa come to his (Ridgely's) office. Although Finkelstein cautioned Villa not to let his anger against Biter lead him to overlook his own financial interests, it is quite clear from the evidence that Villa was referred to Ridgely in the latter's official capacity.

On Thursday, May 28th, Villa went to Ridgely's office on the Green in Dover. He told Ridgely the facts, and demanded prosecution—he wanted to "hang Biter". Ridgely believed that the facts justified criminal proceedings, but sought to dissuade Villa from immediate prosecution because he thought such a course would delay a civil settlement. While Villa was there,

Ridgely telephoned the Biter office and talked to Mr. Murphy, the salesman. Ridgely told Murphy that Lieutenant Villa was with him, complaining that he (Villa) "had been gypped" in his purchase of the car, and that Villa was "pretty well burned up" about it. Ridgely asked Murphy to have Biter call him. Biter did not call him back, and on the following day (Friday, May 29th), Ridgely called Biter. Ridgely told Biter of Villa's complaint, and Biter admitted that his company had sold a used car as a new one. Ridgely questioned him about returning the Ford that Villa had traded in. Biter said it had been sold. Ridgely said Lieutenant Villa wanted to call off the transaction and would not take a new Mercury under any circumstances. Ridgely suggested, in effect, that Biter settle the matter. Ridgely testified:

"I stated to him, that in the interests of his corporation, that a matter like this, if it got spread all around the community, that it would damage his reputation, and that he should seriously consider putting everything back the way it was before it happened."

Shortly after this conversation Villa returned to Ridgely's office. He renewed his request for criminal action. Ridgely again advised against immediate criminal prosecution, but Villa wanted it. Ridgely sent him to the Attorney General's office, where his statement of facts was reduced to writing. He then swore out warrants before the Clerk of the Court of Common Pleas for the arrest of Biter and Murphy on charges of obtaining money by false pretences. However, Ridgely directed his secretary to instruct the Clerk of the Court to hold the warrants and not to serve them. Asked why he held up the warrants, Ridgely testified:

"Well, if Mr. Biter had been arrested I felt reasonably certain that, as a defendant in a criminal action, he wouldn't pay off the money, or pay back to Lieutenant Villa what he had involved in the transaction or call it off. He might eventually, but not in the foreseeable future."

After swearing out warrants Villa returned to Ridgely's office. The matter of recovering his car was discussed. Apparently Villa asked whether a civil settlement would interfere with prosecution, and Ridgely said it would not. Ridgely called Biter, and the possible recovery of Villa's car, or alternatively, a payment to Villa of the trade-in price, was discussed, but nothing was agreed upon. Ridgely advised Villa to go to Biter's, taking some one with him, and obtain, if possible, "some sort of statements or admissions".

Nothing seems to have occurred with respect to the case during the following three days (Saturday, Sunday and Monday), except that on Monday, June 1st, Ridgely again told his secretary that the warrants should not be served.

On Tuesday, June 2nd, Villa came again to Ridgely's office. As a result of Ridgely's recommendations, he had decided to accept restitution, and told Ridgely he would "take his money back"—that is, an amount representing the value of the Ford car that he had traded in. Ridgely telephoned Biter to this effect, and told Biter that Villa would come to discuss the matter.

Before Villa left his office, Ridgely told him there would be an attorney's fee, and suggested that Villa get Biter to pay it. The amount was not mentioned. Villa went to see Biter. There is no substantial dispute as to what occurred. Villa asked for $1800 (the trade-in value of his Ford plus $35 of expenses), the cancellation of his obligations, and an attorney's fee. Without any haggling Biter immediately agreed to these terms. The amount of the fee was not mentioned.

On the following day (June 3d) the settlement was consummated on the agreed basis. Ridgely then stated that his fee would be $624, representing twenty per cent of $3,120, the approximate total of the amounts of Villa's obligations and the trade-in value of the car. Biter was "amazed and surprised" (according to Villa, he "got kind of choked up"), and said (in effect) that if he had thought it was going to be that much, he

would have let the customer take legal proceedings.[1] Without further demur, however, he paid the bill. He subsequently wrote Ridgely, complaining about the amount of the fee, but Ridgely refused to reduce it. Ridgely never took any further steps to prosecute the criminal charges.

In early December a resident of Dover sent a letter to the press purporting to state the facts of the Villa-Biter settlement. Informed of the contents of the letter, the Attorney General telephoned Ridgely for an explanation. In order to confirm his report to his superior officer, Ridgely sent for Biter and asked him to talk to the Attorney General. Biter refused to talk until he consulted his lawyer. Later he did talk.

Ridgely, at the request of the Attorney General, wrote a letter for the newspapers in justification or explanation of his conduct. This letter contained four statements that Ridegly now admits to have been erroneous: (1) that the matter began as a civil one and had no connection with the Attorney General's office; (2) that he had been retained on the basis of the amount collected; (3) that Villa without any investigation or advice secured warrants of arrest; and (4) that after the issuance of the warrants, he (Ridgely) requested that no further action be taken until complete details were made available.

Upon publication of these letters this Court directed the Censor Committee to proceed with an investigation of Ridgely's conduct.

The findings of the Censor Committee upon the Villa matter are to the effect that Ridgely's conduct was unprofessional in that it was (1) a violation of certain of the canons of professional and judicial ethics, and (2) a violation of his duty as a public officer in that he had placed himself in a position where his personal interests were opposed to his duty to the public.

We think it unnecessary to determine whether this case falls within the language of the canons cited by the Com-

---

[1]According to Biter, he said: "I would have let him press charges on me."

mittee.[2] Their underlying intent is to apply to the conduct of the lawyer the injunction that no man can serve two masters. A lawyer cannot represent conflicting interests, because he owes to every client the duty of undivided loyalty. In civil cases he may ordinarily choose between two clients whose interests conflict, with full disclosure when required. But a public prosecutor permitted to engage in private practice has no such freedom of choice. His private interest must yield to the public one.

The facts of the Villa matter show beyond doubt that Ridgely subordinated the public interest to his own. From the beginning he treated Villa as a possible client. According to his testimony, he felt that from the time of his first interview with Villa he was aiding and advising Villa as a private attorney. Speaking of his dealings with Villa, he testified:

"A. He [Villa] was just a difficult client to try to keep going along a path that would serve his own best interests.

"Q. As he saw it? A. As I saw it."

From this point of view it was natural for him to discourage prosecution and advise a civil settlement. Before Villa was content to withhold prosecution, Ridgely undertook to negotiate such a settlement. Moreover, his suggestion to Biter that it was to the latter's interest to avoid public knowledge of the matter was necessarily inconsistent with any intention to prosecute. He believed that Villa's interests required civil action, and that criminal proceedings would prejudice civil recovery. After the warrants had been sworn out, he directed the Court Clerk not to serve them. He finally persuaded Villa to withhold prosecution and accept restitution.

---

[2]Canon 36 of the *Canons of Professional Ethics* relates primarily to the acceptance of private employment by a public officer, after retirement from office, *in connection with a matter which* he has *investigated or passed upon* while in office.

Canon 31 of the *Canons of Judicial Ethics* relates to the practice of law by judges of inferior courts. The Committee on Professional Ethics and Grievances of the American Bar Association has applied it to public prosecutors.

In all this he acted as an attorney would act for a private client—the client's interest came first. It necessarily follows that, as the Committee concluded, he violated the duty that he owed to the public.

In explaining his actions before the Censor Committee, Ridgely sought to show that the case against Biter was weak because the car sold to Villa was probably worth what was paid for it.[3] That argument was also made before us. He also expressed to the Committee an opinion that the misrepresentation in respect of the mileage driven, effected by turning back the speedometer, was not a material misrepresentation. These suggestions have no merit. To sell a used automobile as a new one and turn back its speedometer to conceal its mileage is an extremely shoddy piece of business, to say the least, and reflects no credit upon those who participated in it. Certainly, as Ridgely conceded, a prosecution could be founded upon it.

But this is not the point of the matter. What Ridgely undertook to do was, as Deputy Attorney General, to withhold prosecution because, as Villa's private attorney, he thought that prosecution conflicted with Villa's interests.

It is quite true that there are cases of criminal fraud or injury to property in which the prosecuting officer may properly determine that the public interest will not be prejudiced by withholding prosecution if full restitution is made. But in other cases the violation of law may be so serious that he should listen to no suggestion that the prosecution be dropped.

Now, the exercise of this power by the prosecuting officer—the decision to prosecute or not to prosecute fraud cases—involves the performance of one of the most difficult and delicate functions of his office. It requires the weighing and balancing of interests that may, and often do, conflict—those of the public and those of the victim of the fraud. One thing is cer-

---

[3]The record indicates that it was resold on June 6th as a used car for a price slightly higher than that paid by Villa.

tain. The prosecuting officer cannot perform this function—he cannot discharge his public obligation—if his personal interests are involved. And his representation of the defrauded person at once gives him a personal interest in the matter that disables him from the proper performance of his official duty.

If Ridgely's view was correct that the matter was primarily a civil fraud, he should have referred Villa to independent counsel. If it was his view that the violation of law justified the institution of criminal proceedings, he should have instituted them; and if after full consideration he had then concluded on sufficient grounds to permit a civil settlement, at the urging of independent counsel, he could have done so. What he could not properly do was to act in two capacities—as Deputy Attorney General and as Villa's attorney. The result of Ridgely's course of conduct was in effect to deprive the State of the services of its prosecuting officer in a matter requiring the impartial exercise of official judgment.

But this is not all. There is another feature of this case that has a most unpleasant aspect. That is the collection of the fee from Biter. We ask at once: Why did Biter pay this fee? Why should Ridgely have thought that he might pay it? As an experienced business man Biter must have known that attorney's fees are not collectible from the defendant in a case of this kind. Certainly Ridgely knew it. Yet, without knowing the amount to be charged, Biter agreed at once to pay it. When the amount was told him, he protested but nevertheless paid. He testified that "anyone would assume" such an obligation "in the course of a normal settlement with a customer"; but admitted that he had not on any other occasion paid any customer's counsel fees. At one time in testifying he said that the thought of a criminal violation never entered his mind; but at another time he was asked about the meaning of the phrase "press charges" that he said he had used in his protest against the amount of Ridgely's fee, and he replied that the only charge that he could think of would be misrepresentation. He admitted that the car sold to Villa could not honestly have been represented as a new car. Misrep-

resentation he understood to have a criminal aspect. At the time of the settlement he knew that the speedometer had been turned back and that this was a violation of law. After the settlement he learned of the issuance of the warrant, but did not inquire about it, because he felt that there had been "a mutual settlement". He felt that the settlement "would cancel out" any criminal prosecution because Villa had been made whole. And when asked by Ridgely to explain the matter to the Attorney General, he refused to talk until he had consulted counsel.

We have no doubt that Biter's ready acceptance of the settlement terms, and his payment of the fee, were prompted by anxiety to hush up the matter, and by the belief that he would avert prosecution on a criminal charge.

We should say at once that there is no evidence that Ridgely or Villa ever threatened Biter with criminal prosecution. But the result—the payment of a fee to Ridgely, a prosecuting officer as well as a private attorney—is deplorable. As the Censor Committee observed, such an act necessarily tends to destroy the confidence of the public in the prosecuting officer. It was grossly improper for Ridgely to suggest or receive the payment of any fee by Biter. And to some extent the matter is made worse by the large amount charged—an amount clearly exorbitant, as Ridgely's counsel candidly admits.

As we have indicated, there is no evidence of Ridgely's intentional use of the powers of his office to obtain money. His serious final mistake in the matter of the fee is probably traceable to the initial one—the adoption of Villa as a private client. From this he was led on to a position where, we suspect, he had become blind to the possible implications of what he was doing. The line between public duty and private interest was blurred. The record suggests, however, a certain uneasiness in his mind about the matter. Thus he did not go with Villa to see Biter, because (he said) he was Deputy Attorney General, and it might not appear proper. And an adverse inference must be drawn from the erroneous statements in his letter to the press.

They may have been made hastily, under pressure of time, but it is hard to believe that they do not evidence some consciousness of the impropriety of his conduct.

The Committee's findings of unprofessional conduct in the Villa matter must be approved.

## 2. The *Polin* Case.

As Deputy Attorney General for Kent County, Ridegly's official duties included the representation of the State Board of Health in matters in that County. Prior to 1954 he had been consulted officially by the State Board of Health on more than one occasion.

From June 1951, Ridgely was the attorney for Isadore Polin, founder and president of the Polin Poultry Co., Inc. Polin had acquired a site for a proposed plant in Clayton, Delaware, and Ridgely had advised him on certain legal matters with respect thereto. In 1951 the Town of Clayton refused Polin's request to be allowed to operate a poultry processing plant in the town. In January 1952 the business was incorporated, Ridgely handling the matter. On February 8, 1952, the corporation applied to the State Board of Health for a license to operate a poultry processing plant. The application was denied by the Board on February 15th, for the reason that the town had refused to accept the effluent from the poultry plant into its sewage system. In March 1952 an ordinance was passed by the Town of Clayton prohibiting the erection of poultry processing plants within the town. The corporation made a subsequent application to the Board of Health on July 18, 1952. Sometime during the summer or fall of 1952 Ridgely telephoned the executive secretary of the Board and requested that a decision be given on the second application. This application was likewise denied.

During this time Ridgely shared offices with David Buckson, another attorney. They were not partners but were close associates. Ridgely associated Buckson with him as counsel for the Polin Poultry Co. in connection with its application for a license. In November 1952 the poultry company filed an appeal to the

Superior Court from the decision of the State Board of Health denying its application. The appeal was filed and signed by Buckson, but Buckson throughout acted under Ridgely's instructions, since the poultry company was Ridgely's client.

In November of 1952 Ridgely called Chief Deputy Attorney General Theisen, stationed in Wilmington, and explained his association with Polin and the Polin Poultry Co., and told Theisen that he could not appear for the Attorney General's office to represent the State Board of Health upon the appeal. He did not tell Theisen that he intended to appear for the poultry company.

The ground for the appeal was that the action of the Board in denying the poultry company's application was arbitrary, capricious and unreasonable. The appeal was heard before Judge Terry and at the trial both Buckson and Ridgely appeared on behalf of the Polin Poultry Co., and actively participated in the trial. Mr. Theisen represented the State.

The court held that the action of the State Board of Health was not arbitrary and dismissed the appeal with prejudice.

Upon these facts the Censor Committee made a finding of unprofessional conduct, in that Ridgely violated Canon 6 of the Canons of Professional Ethics, relating to the representation of conflicting interests, and Canon 31 of the Canons of Judicial Ethics, above referred to.

We are in accord with the Committee's finding with respect to Canon 6. It is unnecessary to consider Canon 31. As we have heretofore indicated, public duty commands precedence. It was therefore improper for Ridgely, officially counsel for the State Board of Health, to take a case against it. He nevertheless did.so, and the result was the unseemly appearance in the court of two State's attorneys, one endeavoring to uphold the State's case and the other to overthrow it. We should add that even if Ridgely had not appeared in court the error would not have been cured. The client was Ridgely's and he could not es-

cape the burden of official duty by delegating the case to a lawyer associated with him. At that stage of the case he should have sent his client to other counsel.[4] Moreover, unless he was willing to resign from his office, he should have taken that action as soon as the probable conflict of interests appeared, that is, as soon as action before the Board of Health became necessary.

■ For a law officer of the State to accept private employment in State matters and engage in litigation or the prosecution of claims against a fellow member of the Attorney General's staff is manifestly improper. It is suggested that this has happened frequently in connection with claims for tax refunds before the State Tax Board. If so, that practice is wrong.

■ Before the Censor Committee, and again before us, Ridgely's counsel has earnestly pressed the argument that no conflict of interest existed in the *Polin* case, because the Board of Health was a nominal defendant only, the Town of Clayton being the real party in interest. This argument is founded upon the assertion that Polin had complied with the regulations of the Board, and that the only obstacle to the issuance of the license was the existence of the town ordinance. This is an incorrect view of the matter. The appeal papers charged the Board with arbitrary and capricious action, and the Board was required to defend its action. The executive secretary of the Board and many of the technicians testified in the case. According to Mr. Theisen the Board was the defendant in fact as well as in name. Probably, as Theisen also said, the Board would have been satisfied if the Town of Clayton had been satisfied, but this fact does not change the situation. The State Board of Health—Ridgely's client as well as Theisen's—had determined official policy and had taken official action. This action Ridgely sought to have annulled on the ground that it was arbitrary. There was a direct conflict of interest.

---

[4]"The injunction not to represent conflicting interests applies equally to law partners representing different clients who have interests conflicting with one another; also to lawyers, not partners, having offices together; * * *." Drinker, *Legal Ethics*, 1953, Columbia University Press, N. Y., p. 106.

Ridgely's counsel makes another argument designed to show the inconsistency of the Censor Committee's findings in the *Polin* case. It is founded on the following circumstances:

The charges against Ridgely originally included charges of unprofessional conduct in representing private clients in matters before the State Highway Department and the Delaware Liquor Commission. Both these state agencies employ special counsel and are not represented by the Attorney General's office. It has been the practice in this State for many years for members of the Attorney General's staff to represent private interests before these agencies. The Committee accordingly determined during the hearing that no unprofessional conduct could be founded upon instances of this kind, because the agency had independent counsel, and because Ridgely merely followed a settled practice never before called in question. Upon these matters, therefore, it took no testimony. Ridgely's counsel insists that if the Committee was right in its determination in these cases (as he says it was), it must be wrong in its conclusion in the Polin matter, since in both cases the State is opposed by its own law officer and a conflict of interest exists to some extent. There is some logical force in the argument, but if it were pressed to conclusion the result would not help Ridgely's case; it would merely suggest the impropriety of the State's law officer in appearing for private clients before any State agency.

But we think the Committee was right in deciding to go no further into these matters. Ridgely is not to be blamed for doing what has been done for years without suggestion of criticism. All that the argument shows is that the practices that have grown up in these matters may be inconsistent. This is not surprising; they depend largely upon custom. Indeed such inconsistencies exist in the legislative policy. Thus, the judges of certain of our inferior courts are permitted to engage in private practice, and the judges of other inferior courts are expressly forbidden by law to do so.

This matter of representation by the State's law officers of private clients before agencies having independent counsel is

of importance here only in furnishing an illustration of the difficulties that inevitably flow from the practice of permitting the members of the Attorney General's staff to engage in private practice. We shall have more to say hereafter upon this subject.

As to the Polin matter, it is proper to say that, unlike the *Villa* case, it does not appear that the public interest suffered by reason of Ridgely's conduct. The State was adequately represented. But Ridgely's conduct was nevertheless a violation of the rule not to represent conflicting interests, and the Committee's finding to that effect is approved.

Unprofessional conduct having been found we must determine what disciplinary action should be taken.

One mitigating circumstance at once presents itself. We have already alluded to it. In Delaware, all the members of the Attorney General's staff are permitted by long-established usage to engage in the private practice of law. This, notwithstanding the fact that all of the State's legal business, civil and criminal (with the exception of that appertaining to agencies with independent counsel), is concentrated in the office of the Attorney General. This situation is the outgrowth of legislative policy, which, as we have recently pointed out, permits the State to obtain the services of well-qualified attorneys at salaries that would not be attractive if the official were required to devote his entire time to his duties.[5]

This policy has unfortunate consequences. Its result is to cast upon the occupant of the office the burden of determining for himself the limits which must circumscribe his private practice. It is easy to say that in a doubtful case he should decide against himself. That is true. But lawyers, of course, are subject to human weakness, and the inevitable result is that in some cases—relatively few, we like to think—considerations of self-interest will entice the holder of the office away from the performance of his duty. Moreover, as the Censor Committee ob-

[5]Application of Young, Del., 104 *A.* 2d 263.

served in its report, the established custom of permitting the State's law officers to engage in private practice has led to confusion and misunderstanding in the minds of the lawyers, because in many cases the line between propriety and impropriety is hard to draw.

The modern tendency is to remedy this evil by striking at its root—by prohibiting lawyers representing the State from engaging in private practice. As of January 1, 1953, lawyers employed by the Department of Justice are prohibited (except by special permission of the Attorney General) from engaging in private practice.[6]

The situation in Delaware suggests strongly the need for the General Assembly to review and reconsider its policy in these matters. It is for the General Assembly and not for the courts to determine legislative policy; but the subject is one that touches closely the administration of justice. As such, we think it a proper one for judicial criticism.

The pertinency of these observations to the case before us lies in the fact that when Ridgely assumed his office he, like all others who have held it, became a part of an unfortunate system. For the inherent weaknesses and difficulties of that system he is not to be blamed. Its existence tends to mitigate his offense.

We take into consideration also the fact of the publicity and adverse criticism that have attended this matter. We cannot doubt that he has suffered from it in many ways.

These considerations have led us to the conclusion that the disciplinary action to be taken should be limited to a severe reprimand, provided certain conditions are met. These conditions concern the fees collected or billed in the two cases. Since the fee of $624 in the *Villa* case was improperly collected, it should be returned to the Biter Company; in fact, Ridgely has expressed his willingness to return it. As for the fee in the Polin

---

[6]Order No. 4231, Attorney General, Dec. 15, 1952.

matter, it appears that at the time of the hearing, a bill for $2,000, representing all of Ridgely's services to the Polin Company, had been sent but not paid. So much of this fee as is allocable to proceedings before the Board of Health, as well as to the appeal proceedings, should not be collected or retained by Ridgely, since it represents payment for work done in opposing the interests of the State.

If Ridgely elects to comply with these conditions, his assent may be evidenced by an appropriate certificate of his counsel, filed with the Clerk. In that event, disciplinary action will be limited as above indicated, and the reprimand administered at the next session of this Court. Otherwise, the matter will be further considered.