**Alen L. SETH, Jr., Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Nov. 21, 1990.
Decided: May 30, 1991.

Leo John Ramunno of Ramunno & Ramunno, Wilmington, for appellant.

Gary A. Myers, Deputy Atty. Gen., Dept. of Justice, Georgetown, for appellee.

Before CHRISTIE, C.J., HORSEY and WALSH, JJ.

HORSEY, Justice:

Alen L. Seth, Jr. appeals Superior Court's affirmance of his conviction in the Court of Common Pleas of Driving a Motor Vehicle While Under the Influence of Alcohol, 21 *Del.C.* § 4177. His appeal raises two issues. The first issue is whether the Attorney General is authorized under 29 *Del.C.* § 2505 to appoint a part-time prosecutor employed and compensated by a private law firm to prosecute criminal cases for the State, and if so, whether such practice violates the Delaware Lawyers' Rules of Professional Conduct. The second issue is whether the results of an intoxilyzer test

were obtained in violation of Delaware's "implied consent" law, 21 *Del.C.*, chapter 27, for failure of the arresting officer to read the statute to defendant or to fully inform defendant of his rights. On the first issue, we hold that the Attorney General, in creating the "Lend–A–Prosecutor" program, acted within the broad statutory power to act in the public interest. We further find, in the exercise of this Court's exclusive jurisdiction to regulate the practice of law in Delaware, that the "Lend–A–Prosecutor" program does not violate the Delaware Lawyers' Rules of Professional Conduct (hereinafter "the Rules"). On the second issue, we hold that under the Delaware statutory scheme, the failure of an arresting officer to inform defendant of the implied consent law and any right to refuse chemical testing provides no defense to the admissibility of the chemical test. Finding no merit in either of defendant's contentions, we affirm the conviction.

I

On the evening of July 12, 1989, a New Castle Police Department officer stopped Alen Seth when the officer observed Seth driving a Camaro, repeatedly drifting across a lane divider. As the officer approached the car, he detected an odor of alcohol and noticed that Seth's eyes were bloodshot. Seth told the officer that he was tired and had two beers prior to the stop. The officer then requested that Seth perform several field coordination tests, including walking heel to toe, touching the tip of the nose with a finger, and reciting the alphabet. The officer testified at trial that these routine tests were inadequately performed.

Consequently, the officer took Seth to the New Castle County Police Headquarters to obtain a breath sample to measure blood alcohol content. At the station, Seth requested an opportunity to speak to an attorney prior to taking the intoxilyzer test. The officer responded that "under Delaware Law [Seth] wasn't given an absolute right to speak to an attorney prior to taking the test. He was required by Delaware Law to submit to the test." Seth refused to take the test several times, and it is undisputed that the officer never read Seth the implied consent law. Seth testified that the officer asked, "Are you ready to take the test or do you want to go to jail?" The officer denied making the statement, but indicated that he gave Seth time to "think it over," and Seth relented and gave the breath sample after five to ten minutes. The test revealed a blood alcohol concentration of .19 percent.

Seth was tried in the Court of Common Pleas on September 5, 1989. The prosecutor on the day of Seth's trial was one in the first group of attorneys participating in a special Deputy Attorney General program. The so-called "Lend–A–Prosecutor" program was established by the Attorney General in cooperation with the law firm of Skadden, Arps, Slate, Meagher, and Flom ("Skadden, Arps"). Skadden, Arps allows its Delaware licensed attorneys to lend their services as prosecutors for the Department of Justice for periods of roughly two weeks. The attorneys are deputized by the Attorney General to prosecute criminal cases under supervision of the Department of Justice but, as "Special Deputy Attorneys General" ("SDAG's"), they continue to be paid by Skadden, Arps. During the period of their voluntary service, the SDAG's are required to devote their full time to their duties as Deputy Attorneys General, and are not permitted to do any substantial work for Skadden, Arps.

Seth moved to disqualify the prosecutor prior to trial, arguing that the Lend–A–Prosecutor program is impermissible in that the prosecutors are not full-time State employees compensated by the State. Seth further argued that the program had ethical defects in that the volunteer prosecutors sought to obtain trial experience, and not simply to "do justice." The Court of Common Pleas denied the disqualification motion, and the Superior Court affirmed this ruling.

During the trial, Seth objected to the introduction of the results of the intoxilyzer test on the basis that the arresting officer had not followed the implied consent law and had improperly ignored Seth's ini-

tial refusals to give a breath sample. The Court of Common Pleas ruled this evidence admissible, and the Superior Court upheld this ruling.

## II

Seth maintains that the trial court erred in denying his motion to disqualify the prosecutor, a private attorney acting under the Lend–A–Prosecutor program. In support of his position that the program is "illegal," defendant relies *In Re Ridgely*, Del.Supr., 106 A.2d 527 (1954), in which this Court addressed the problems and potential conflicts created when a part-time public prosecutor engages in private practice. Defendant further contends that the program is prohibited by the Department of Justice Act, 29 *Del.C.*, chapter 25. Specifically, defendant argues that 29 *Del.C.* § 2505 prohibits prosecutors from engaging in private practice and requires that prosecutors remain under the supervision and control of the Attorney General. Defendant maintains that these statutory requirements cannot be met where prosecutors are employed and compensated from private sources.

At trial, the Court of Common Pleas accepted the prosecutor as being a deputy designated by the Attorney General, and therefore denied defendant's motion to disqualify the prosecutor. On direct appeal, the Superior Court ruled that the broad language of 29 *Del.C.* § 2505 may be construed to impliedly authorize the Attorney General to appoint a prosecutor for a two-week period even though that prosecutor is engaged in private practice and compensated by the law firm. The Superior Court further ruled that a prosecuting attorney may engage in private practice, where not prohibited by statute, in the absence of an existing conflict between public duty and private practice. The Superior Court found no indication of such a conflict in the case before it.

■ The questions of whether the Attorney General had statutory authority to adopt the Lend–A–Prosecutor program and whether that program otherwise violates the Delaware Lawyer's Rules of Professional Conduct involve issues of law requiring the exercise of *de novo* review. *In Re Appeal of Infotechnology, Inc.*, Del.Supr., 582 A.2d 215, 218 (1990); *In Re Berl*, Del. Supr., 540 A.2d 410, 413 (1988). We review these questions in the exercise of this Court's exclusive jurisdiction over the regulation of the Bar and the practice of law in Delaware. *Infotechnology*, 582 A.2d at 218; *In Re Green*, Del.Supr., 464 A.2d 881, 885 (1983). "[T]he interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar." *In Re Green*, 464 A.2d at 885.

■ Before examining the authority of the Attorney General to establish the Lend–A–Prosecutor program pursuant to 29 *Del.C.*, chapter 25, we briefly examine the nature of the office of Attorney General. The Attorney General is a constitutional officer vested with the broad authority to exercise numerous and varied powers. Absent legislative restriction, the Attorney General "may exercise all such power and authority as the public interests may from time to time require." *Darling Apartment Co. v. Springer*, Del.Supr., 22 A.2d 397, 403 (1941). The powers and duties of the chief law officer of the State can be modified by the General Assembly, which

> can add to or subtract from the common law powers of the Attorney General.... In the absence of legislation the authority and the duty of the Attorney General to appear in Court for the State or its immediate agencies has, I think, been universally recognized. If this authority is to be lessened or changed in any manner it should be done by express legislative action.

*Darling Apartment*, 22 A.2d at 408 (Rodney, J., concurring). In the exercise of his official powers, the Attorney General has discretion in determining who shall be prosecuted and in what manner that prosecution shall take place. *O'Neal v. State*, Del.

Supr., 247 A.2d 207, 209 (1968); *State v. Dennington*, Del.Super., 145 A.2d 80, 84 (1958). Given the broad authority of the Attorney General, we must determine whether the Lend–A–Prosecutor program contravenes any clear legislative proscription of 29 *Del.C.* § 2505. *Cf. In Re Blue Hen Country Network, Inc.*, Del.Super., 314 A.2d 197, 200 (1973) (Attorney General's investigative powers are broad, but Attorney General's subpoena powers limited by statute).

█ In construing 29 *Del.C.*, chapter 25, we note that when statutory language is both clear and consistent with other provisions of the same legislation and with legislative purpose and intent, a court must give effect to that intent because it is for the legislature, and not the courts, to declare the public policy of the state. *Ames v. Wilmington Housing Authority*, Del. Supr., 233 A.2d 453, 456 (1967).

█ The Superior Court declined to construe the Department of Justice Act, 29 *Del.C.*, chapter 25, narrowly so as to bar the Attorney General from adopting the Lend–A–Prosecutor program. We agree. In its present form, 29 *Del.C.* § 2505 provides, in pertinent part:

(d) The Attorney General may appoint, within the limits of the appropriations made to the State Department of Justice, residents of this State, authorized by rule of the State Supreme Court to practice law in the courts of this State, to be his assistants or special assistants, who shall have such powers, duties and responsibilities as designated by the Attorney General.

\* \* \* \* \* \*

(i) The Attorney General may appoint, from residents of this State, authorized by rule of the State Supreme Court to practice law in this State, persons in addition to those authorized by appropriations to the Department to be his assistants and special assistants, to be compensated from federal funds and funds other than those funds appropriated to the State Department of Justice, to have

such powers, duties and responsibilities as designated by the Attorney General; provided, however, that the tenure provisions of § 2511 of this title shall not apply to such assistants and special assistants and provided further that the State shall not be obligated to continue their employment when or in the event such federal funds or such other funds are no longer available to pay their salaries.

29 *Del.C.* § 2505. Either of these sections provides the Attorney General with the broad authority to appoint assistants, provided they are residents of Delaware and authorized by this Court to practice law in Delaware. The overall scheme of the statute further makes clear that the Attorney General shall devote his full time to the office and shall not engage in the private practice of law; however, the statute gives the Attorney General authority to employ *part-time* [1] as well as full-time assistants:

(f) The Attorney General may assign an assistant or special assistant to serve in any legal capacity in or for any office, department, board, agency, commission or instrumentality of the state government *on a part-time or full-time basis* whenever, in the judgment of the Attorney General, such assignment will contribute to the efficiency of the operation of such office, department, board, agency, commission or instrumentality; but such assistant shall remain under the supervision and control of the Attorney General while so serving.

\* \* \* \* \* \*

(h) The Attorney General shall devote full time to the office and shall not practice law for the term to which he is elected. *He shall determine whether any of his assistants other than those designated as full time in this section shall be excluded from the practice of law.* The salaries of the Chief Deputy and assistants shall be as fixed by the Attorney General within the appropriations made to the State Department of

---

1. Under the statute, the Chief Deputy Attorney General, the State Solicitor, and the State Prose-

cutor *must* serve on a full-time basis. 29 *Del.C.* § 2505(a), (b), and (c).

Justice and the limitations of § 2506 of this title.

29 *Del.C.* § 2505 (emphasis added). Thus, defendant's objections to the part-time status of the prosecutors must be rejected. The statute, read as a whole, clearly contemplates that the Attorney General be a full-time officer not otherwise engaged in the practice of law, but that the Attorney General have the authority to appoint part-time or full-time assistants. 29 *Del.C.* § 2505(f), (h).

■ Defendant also objects to the payment of the volunteer prosecutors by Skadden, Arps. Defendant maintains that the prosecutors cannot be "under the supervision and control of the Attorney General" as required by section 2505(f) when they are compensated by a private law firm. Defendant points to 29 *Del.C.* § 2506, which states that salaries of attorneys employed by the Attorney General be fixed "within the appropriations made to the Department of Justice pursuant to a salary plan established by the Attorney General." 29 *Del.C.* § 2506(b).

We do not find the argument persuasive. Subsection (i) contemplates the appointment of special assistants "to be compensated from federal funds and *funds other than those funds appropriated to the State Department of Justice.*" 29 *Del.C.* § 2505(i) (emphasis added). We agree with the Superior Court's construction of this language to encompass compensation from private sources, and further find that the payment from private sources does not defeat the control and supervision of the Attorney General. The program was designed so that the volunteer prosecutors would devote their full energy to their prosecutorial duties during the period of their service. The Superior Court found that "[o]ne purpose in establishing this program was to expedite the disposition of Delaware's overcrowded criminal dockets through the appointment of additional prosecutors." This purpose is consistent with the legislative mandate of section 2505(f) that special assistants serve in any legal capacity to "contribute to the efficiency of the operation...." 29 *Del.C.* § 2505(f).

Defendant's reliance on *In re Ridgely,* 106 A.2d at 527, is misplaced. In *Ridgely,* a deputy Attorney General undertook the representation of a client who had been sold a used automobile as a new one. Ridgely persuaded the private client to withhold prosecution because it would interfere with his civil recovery. This Court held:

> The prosecuting officer cannot perform this function—he cannot discharge his public obligation—if his personal interests are involved. And his representation of the defrauded person at once gives him a personal interest in the matter that disables him from the proper performance of his official duty.... The line between public duty and private interest was blurred.

106 A.2d at 531, 532. The context of the *Ridgely* decision was important. At the time of the decision, "*all the members* of the Attorney General's staff [were] permitted by long-established usage to engage in the private practice of law." *Id.* at 535 (emphasis added). *See also Application of Young,* Del.Supr., 104 A.2d 263, 265 (1954) (noting that the custom "evidences a legislative policy that permits the State to obtain the services of well qualified attorneys at salaries that would not be attractive if the official were required to devote his entire time to his duties"). The *Ridgely* Court noted "unfortunate consequences" resulting from the longstanding practice due to the difficulty in drawing the line between propriety and impropriety. The Court then suggested:

> the need for the General Assembly to review and reconsider its policy in these matters. It is for the General Assembly and not for the courts to determine legislative policy; but the subject is one that touches closely the administration of justice.

106 A.2d at 535.

We find no legislative policy which prohibits the innovative program at issue here. As originally enacted, the State Department of Justice Act allowed the Attorney General to engage in the private practice of law. 56 *Del.Laws* ch. 326, § 1, 29 *Del.C.*

§ 2505(k) (1967). In 1971, section 2505 was amended in its entirety, substituting a new subsection (h) to § 2505, which plainly prohibits the Attorney General from engaging in private practice; however, it allows the Attorney General to determine whether his deputies,[2] other than those designated as full-time under the statute, may engage in the private practice of law. 58 *Del.Laws* ch. 99, § 1, 29 *Del.C.* § 2505(h) (1971). Thus, defendant's argument that the Lend–A–Prosecutor program is inconsistent with the statute is incorrect. We decline to construe the Act narrowly to bar the program.

■ We now turn to defendant's objections to the program based on ethical considerations. Apart from the statutory prohibition, defendant contends that the program is "improper." Defendant suggests that the program violates the Delaware Lawyer's Rules of Professional Conduct because the program is designed primarily not to obtain justice, but to allow young associates to obtain trial experience. Defendant finally objects to the "appearance of impropriety" created by the program.

Defendant correctly notes that it is the responsibility of a prosecutor to "seek justice, not merely convictions." *Hughes v. State*, Del.Supr., 437 A.2d 559, 566 (1981). *See also* Del.R.Prof.C. 3.8 comment; ABA Standards for Criminal Justice, The Prosecution Function Std. 3–1.1 (2d ed. 1980) (hereinafter "ABA Standards"). While trial experience for young attorneys may be an incidental benefit of the program, defendant has not demonstrated how the Lend–A–Prosecutor program will prevent the interests of justice from being served. If the program contributes to the efficient operation of the Attorney General's office, quite the opposite should be true. *See* 29 *Del.C.* § 2505(f); ABA Standards, Std. 3–2.4 commentary ("The incidence of crime is not sufficiently predictable to permit reliable calculation of the staff needs at every moment during the year. It is important that the prosecutor have flexibility in meeting this situation, so that the office is not forced to dispose of cases on a basis not fully compatible with the interests of the public merely because of an unusually heavy workload.").

■ Defendant argues that the program creates inherent conflict of interest problems. The prosecutor, as a lawyer, must be subject to standards of professional conduct. *State v. Wilson*, Del.Supr., 545 A.2d 1178, 1183 (1988) (citing ABA Standard 3–2.1). Rule 1.7 governs a lawyer's representation of conflicting interests. This Rule's purpose is to "ensure a lawyer's duty of loyalty to the client." *Infotechnology*, 582 A.2d at 220. In addition, 29 *Del.C.* § 2509 specifically prohibits a member of the Department of Justice from acting as an attorney in any controversy in which the State has an interest, except in his or her official capacity. However, on appeal defendant does not attempt to dispute the Superior Court's finding that there was "no indication that the prosecutor appointed under this program was faced with any conflict of interest."

We recognize that there is a potential for financial and other conflicts to develop when a private attorney becomes a prosecutor, even for a brief period of time. *See generally* R. Underwood & W. Fortune, *Trial Ethics* § 14.3.4, Prosecutor's Conflicts (Supp.1990); C. Wolfram, *Modern Legal Ethics* § 8.9 (1986); Supreme Court Advisory Committee, *A Comparative Study of the ABA Standards for Criminal Justice with Present Delaware Law*, the Prosecution Function Std. 1.2 comment at 288 (1976) ("improper for a member of the Attorney General's office to practice with a firm that handles any legal matters involving the State of Delaware). However, we find no bar to the Lend–A–Prosecutor program on ethical grounds where no actual conflict between the public and private interest is presented. *See, e.g.*, ABA Comittee on Ethics and Professional Responsibility, Informal Op. C–772 (1964) (State Prosecuting Attorney may engage in private practice where permitted by law

2. Deputies are presently designated as "assistants" under the statute. 59 *Del.Laws* ch. 289, sec. 2 (1973).

and no conflict of interest involved); ABA Committee on Ethics and Professional Responsibility, Formal Op. 278 (1948).

■ Absent the existence of a conflict, we further will not bar the Lend–A–Prosecutor program based on an unarticulated concern for the "appearance of impropriety." *See* Rule 1.10 comment, Lawyers moving between firms. *See also* Wolfram, *Modern Legal Ethics* § 7.1.4 (criticizing appearances test as imprecise and leading to ad hoc results). The Rules may not be used for tactical purposes to disqualify prosecutors where no realistic likelihood of conflict appears. *See Infotechnology,* 582 A.2d at 220–221. We therefore find no merit to defendant's claim that the program violates the Rules.

### III

We now turn to Seth's second argument challenging the admissibility of the results of the intoxilyzer test. Seth contends that had he been informed of Delaware's implied consent law and not threatened with jail, he would not have taken the breath test. Defendant argues that the purpose of the implied consent law is to inform the defendant of his rights so that a knowing election whether or not to submit to the test may be made. Seth argues that he could not have made a knowing election since he was never read the implied consent law, a fact which was not disputed at trial. Seth further maintains that he was misinformed when the officer stated that he was required to submit, and that this misinformation made his actions involuntary. Defendant testified at trial that this "misinformation" was the officer's statement, "Are you ready to take the test or do you want to go to jail?" At trial, the officer denied making the statement.

In overruling Seth's objection to the introduction of the results of the breath sample, the Court of Common Pleas found the facts of the case "rife with probable cause," and the court ruled that the defendant took the test voluntarily. The Superior Court affirmed this ruling, finding: (1) no legal significance to Seth's inability to speak to counsel before submitting to the test based on this Court's holding in *Brank v. State,* Del.Supr., 528 A.2d 1185 (1987); (2) the officer had probable cause to test Seth, and there being no indication in the record that the tests were obtained illegally, the results were admissible; and (3) the record supports the lower court's finding that the test was taken voluntarily.

■ Seth's contentions on appeal are based on a plain misreading of the current Delaware implied consent law; and we accordingly affirm the Superior Court's ruling that the results of the test were admissible. In 1982 and 1983, the General Assembly extensively modified 21 *Del.C.,* chapters 27 and 41, relating to the operating of motor vehicles, suspension and revocation of driver's license for refusal to submit to chemical testing, and driving under the influence of alcohol or drugs. 63 *Del. Laws,* ch. 430 (1982); 64 *Del.Laws,* ch. 13 (1983). These statutory modifications represent a dramatic change in the concept and operation of the implied consent law of Delaware.

As restated, 21 *Del.C.* § 2740 [3] renders the operation of a motor vehicle a constructive consent of the operator to submit to testing for alcohol or drugs by an officer having "probable cause to believe" the operator was in violation of 21 *Del.C.* § 4177 or § 2742. Previously, if a person arrested under section 4177 refused to submit to chemical testing upon a request to do so, the test "*shall* not be given." 61 *Del.*

---

**3.** The Delaware implied consent law states:

§ **2740. Consent to submit to chemical test; probable cause.**

Any person who drives, operates or has in actual physical control a vehicle, an off-highway vehicle, a moped or a bicycle within this State shall be deemed to have given his consent, subject to this section and § 4177 of this title to a chemical test or tests of his blood,

breath and/or urine for the purpose of determining the presence of alcohol or a drug or drugs. The testing may be required of a person when an officer has probable cause to believe the person was driving, operating or in physical control of a vehicle in violation of § 4177 or 2742 of this title, or a local ordinance substantially conforming thereto.

21 *Del.C.* § 2740.

*Laws,* ch. 474, § 1, 21 *Del.C.* § 2742(a) (1977) (emphasis added). The 1982 and 1983 statutory amendments remove the absolute bar to testing upon a refusal. The reading of the implied consent law by an officer to the accused is now stated in permissive language:

> At the time a chemical test specimen is required, the person *may be informed* that if testing is refused, the person's driver's license and/or driving privilege shall be revoked for a period of at least 1 year.

21 *Del.C.* § 2741(a) (emphasis added). Further, an officer can now take "reasonable steps" to conduct testing *without consent:*

> **§ 2742. Revocation; notice; hearing.**
>
> (a) If a person refuses to permit chemical testing, after being informed of the penalty of revocation for such refusal, the test shall not be given but the police officer *shall report* the refusal to the Department. The police officer *may,* however, take *reasonable steps* to conduct such chemical testing *even without the consent* of the person if he seeks to conduct such test or tests *without informing the person of the penalty of revocation for such refusal* and thereby invoking the implied consent law.

21 *Del.C.* § 2742(a) (emphasis added).

Finally, the amendments added a new section to eliminate any defense to the admissibility of the results of chemical tests based on a failure to inform the accused of the implied consent law, where Fourth Amendment concerns are not implicated:

> **§ 2750. Admissibility in evidence of results of chemical test.**
>
> (a) Upon the trial of any action or proceeding arising out of acts alleged to have been committed by any person while under the influence of alcohol, a drug or drugs, with respect to any chemical test taken by or at the request of the State, the court shall admit the results of a chemical test of the person's breath, blood or urine according to normal rules of search and seizure law. *The informing or failure to inform the accused concerning the implied consent law shall not affect the admissibility of such results in any case, including a prosecution for a violation of § 4177 of this title.* The informing of an accused concerning the implied consent law shall only have application and be relevant at a hearing concerning revocation of the driver's license of said person for a violation of the implied consent law. *Nothing contained in this section shall be deemed to preclude the admissibility of such evidence when such evidence would otherwise be admissible under the law relative to search and seizure law* such as when such evidence has been obtained by valid consent or other means making the obtaining of the evidence legal under the Fourth Amendment.

21 *Del.C.* § 2750(a) (emphasis added). The net effect of the amendments is an officer's ability to require a suspect to submit to testing, without that person's consent or a reading of the implied consent law, so long as the officer has probable cause and the degree of force used is not excessive under the Fourth Amendment. *Brank,* 528 A.2d at 1189–1190. *See also South Dakota v. Neville,* 459 U.S. 553, 559, 103 S.Ct. 916, 920, 74 L.Ed.2d 748, 756 (1983); *Schmerber v. California,* 384 U.S. 757, 760 n. 4, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908, 913 (1966).

The record indicates that defendant initially requested to speak to an attorney when the officer told defendant about the breath test.[4] The officer denied the request and told defendant that he was required by law to take the test. Then defendant refused to take the test several times. At this point, the officer did not inform the defendant of the implied consent law, i.e., inform him of the consequences of the refusal. Rather, the officer gave defendant time to "think it over." Clearly, the officer was taking "reasonable steps" to conduct the test without reading

---

**4.** Defendant does not challenge on appeal the denial of an attorney prior to taking the intoxilyzer test. As the Superior Court held, this claim is clearly without merit under our holding in *Brank,* 528 A.2d at 1190.

defendant the implied consent law, consistent with 21 *Del.C.* § 2742(a). We have recently reaffirmed that a person suspected of drunk driving has *no right* to refuse testing "unless a police officer informs him that he may lose his license for a year if he withholds consent." *McCann v. State*, Del.Supr., 588 A.2d 1100, 1101 (1991).

We have previously held that the Delaware statute allows an officer to require submission to testing without consent, and that the statute affords no choice. *Brank*, 528 A.2d at 1189–1190. "An arresting officer is not required to advise a suspect of any 'right' to refuse testing, or the penalty for such a refusal. Such a suspect is, then, legitimately 'forced' to submit to the test." *Id.* at 1190.

Defendant finally argues that his consent to take the test was involuntary due to the officer's alleged threat to take the defendant to jail. Defendant argues that the purpose of the implied consent law is to give the accused information so that a knowing election whether to comply can be made, and if the law is not complied with, the evidence must be excluded. *See Bertomeu v. State*, Del.Supr., 310 A.2d 865, 866 (1973); *State v. Purcell*, Del.Super., 336 A.2d 223, 227–228 (1975).

Defendant's position is incorrect as a matter of law. Under Delaware law, an officer can proceed *without consent* under section 2742(a). *Brank*, 528 A.2d at 1189. Therefore, defendant's argument that his consent was involuntary is irrelevant. Furthermore, even if the officer had violated the implied consent law, any argument to exclude the evidence is irrelevant. Section 2750(a) eliminates any defense to admissibility not implicating the Fourth Amendment.[5] 21 *Del.C.* § 2750(a). We further note the conclusion of the Court of Common Pleas, based on testimony of the defendant and arresting officer, that the test was taken voluntarily. If such a finding is "supported by the record ... and the product of an orderly and logical deductive process," the Superior Court must accept the finding. *State v. Cagle*, Del.Supr., 332 A.2d 140, 142 (1974). Faced with conflicting testimony as to whether the officer threatened to "take defendant to jail," the trial judge was in the best position to determine the credibility of the witnesses. *McCann*, 1101–02. The Superior Court found no indication that the trial court's finding was erroneous, and we agree. None of defendant's grounds for exclusion of the test results rise to constitutional dimensions.

\*      \*      \*

Affirmed.

---

**5.** Defendant has made no claim that excessive force, threatening his safety or health, was used by police in obtaining the sample. *See McCann,* at 1102. *See also Winston v. Lee,* 470 U.S. 753, 761–63, 105 S.Ct. 1611, 1617–18, 84 L.Ed.2d 662, 669–70 (1985).