Linda L. CHARBONNEAU, Defendant
Below Appellant,

v.

STATE of Delaware, Plaintiff
Below Appellee.

No. 253, 2004, 254, 2004.

Supreme Court of Delaware.

Submitted: Nov. 7, 2005.

Decided: March 1, 2006.

Craig A. Karsnitz (argued), Young Conaway Stargatt & Taylor, Georgetown, Delaware and Thomas A. Pederson, Georgetown, Delaware, for appellant.

Kim E. Ayvazian (argued), Department of Justice, Georgetown, Delaware and John Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice, for the Majority.

The State indicted Linda Charbonneau, her daughter, Mellisa Rucinski, and Willie Tony Brown for criminal offenses arising out of the murders of John Charbonneau and William Sproates.[1] The State entered into plea agreements with Mellisa and Brown contingent on their providing truthful proffers and truthful testimony at Linda's trial.

Twelve days before opening statements at Linda's trial, the prosecutors produced a potential witness list for *voir dire* that included both Brown and Mellisa. The prosecutors knew that there were inconsistencies in Mellisa's and Brown's proffered versions of the critical events at least six months before Linda's trial. Despite that knowledge the prosecutors waited until four days into jury selection and four days before scheduled opening statements to notify the trial judge and the defense that they would not be calling Brown as a witness because they believed Mellisa's proffered version of the facts, but not Brown's. Linda's counsel, however, had extensively prepared their defense at trial on the assumption that Brown would be called as a witness to testify. Because the state's thirteenth hour decision not to call Brown would essentially eviscerate their defense strategies, defense counsel sought two forms of relief: (i) a "missing witness" instruction, and (ii) an *in limine* order admitting Brown's plea and proffer into evidence for the purposes of impeaching Mellisa and creating reasonable doubt about the State's case. The trial judge denied the missing witness instruction, ruling that it was "not natural" for the State

to call Brown so long as the State "believed" that Brown was lying. In addition, the trial judged ruled that the fact that Brown had pleaded guilty to first degree murder and the facts stated in Brown's proffer that formed the basis of Brown's plea bargain were inadmissible as evidence at the trial because they were irrelevant and because any probative value that evidence might have was substantially outweighed by the danger of unfair prejudice or misleading the jury. By so ruling, the trial judge essentially determined as fact the State's unilateral determination about Brown's and Mellisa's respective credibility, and removed that credibility issue from the ultimate fact finder.

The defendant has appealed, asserting six claims of error, including these two rulings. We determine that the trial judge abused his discretion in denying Linda's motion *in limine* because the exclusion of evidence relevant to the credibility of one of the State's two primary fact witnesses removed from the jury, as ultimate finder of fact, the opportunity to consider and decide which of the two State's witnesses was more credible.[2] The result was to undermine confidence that the defendant received a fair trial. Therefore, although we uphold the trial judge's other rulings challenged on this appeal, we reverse the conviction on the ground that the trial judge's denial of the motion *in limine* fatally undermined the fairness of the trial. Accordingly, the judgment is reversed and remanded for a new trial.

## I. FACTS

The facts of this case are complex. We summarize at this point the facts that are

---

1. We refer to Linda Charbonneau as "Linda," Willie Tony Brown as "Brown," Mellisa Rucinski as "Mellisa," John Charbonneau as "John," and William Sproates as "Sproates" throughout this Opinion.

2. That determination makes it unnecessary to decide Charbonneau's claim regarding the trial judge's denial of her request for a missing witness instruction. We find no error in any of the other rulings of the trial judge.

relevant to our holding. Other sections of this Opinion addressing the specific issues on appeal discuss those facts, where relevant, in more detail.

Linda was married to John, and later, to Sproates. Linda remained romantically involved with both men in varying degrees and had moved between the residences of John and Sproates several times.[3] In the fall of 2001, John and Sproates were reported missing. Sproates's body was eventually found in John's backyard. A murder investigation ensued. Linda became a primary suspect. The investigation ultimately suggested that Linda, Mellisa, and Mellisa's boyfriend, Brown, participated in John's and Sproates's murders. All three were eventually indicted and the State began to prepare for trial.

In April of 2003, the State began to discuss a plea bargain with Brown. On April 10, 2003, the State sent a letter to Brown discussing the terms under which it would allow Brown to plead guilty. The State offered Brown a plea of guilty to two counts of First Degree Murder. Brown would be required to provide the State with a truthful written proffer, a truthful formal videotaped statement, and truthful testimony at Linda's and Mellisa's trials. In return for Brown's cooperation, the State promised to recommend life in prison at his sentencing.[4] Brown accepted the State's offer and sent a written proffer to the State on April 22, 2003 outlining his version of how the murders took place. Brown's proffer implicated himself, Linda, and Mellisa in the murders. In his prof-

fer, Brown suggested that the motive to kill John resulted from pornographic pictures of Mellisa's oldest daughter found on John's computer. Brown further proffered that Mellisa had actively participated in Sproates's murder: Mellisa stabbed Sproates while Brown beat him with a homemade weapon. The State and Brown agreed to the deal and Brown pleaded guilty to two counts of Murder in the First Degree on April 24, 2003. Under the terms of the agreement, sentencing was deferred until his codefendants' cases were resolved.

On October 8, 2003, approximately six months after Brown's plea, the State began plea discussions with Mellisa. Armed with Brown's proffer implicating Mellisa in the murders, the State offered Mellisa a plea to Second Degree Murder for John's death, and to Conspiracy in the First Degree for Sproates's murder. The terms of the plea agreement required Mellisa to provide a truthful written proffer and truthful testimony at her codefendants' trials. Mellisa accepted the State's offer and sent the State a proffer outlining her version of the murders. Mellisa's account of the murders differed substantially from Brown's.

The two proffers differed in the following ways:

- Brown suggested in his proffer that Mellisa was actively involved in Sproates's murder. Mellisa, however, proffered that she was miles away when the murder occurred, and that Brown

---

**3.** John and Sproates lived in Bridgeville, Delaware and Magnolia, Delaware, respectively.

**4.** Further, the agreement also provided that a *nolle prosequi* be entered on two charges of Conspiracy in the First Degree and one charge of Possession of a Deadly Weapon During the Commission of a Felony.

Brown, as a prior violent felon, faced a designation as a habitual criminal pursuant to 11 Del. C. § 4214(b) and a mandatory life sentence if convicted of either murder. Thus, the best Brown could hope for was a life sentence.

had committed the murder alone at Linda's request.

• Brown claimed that the motive behind killing John originated from pornographic pictures of Mellisa's oldest child found on John's computer. Mellisa proffered that the motive to kill John stemmed from constant battles between Linda and John over material possessions.

• Brown proffered that Linda killed John and that all he (Brown) did was bury John's body. Mellisa, however, proffered that she witnessed Brown beating John. Mellisa also claimed that after the beating, while John was still alive, she drove Brown and John to a secluded area where Brown killed John with a blunt object and buried him.

Despite the obvious inconsistencies in the proffers (both plea agreements were predicated on each defendant telling the truth), the State permitted Mellisa to plead guilty to Second–Degree Murder and First Degree Conspiracy. Mellisa's agreement, like Brown's, deferred sentencing until her codefendants' trials were completed.

Linda and the State never reached a plea agreement, and the Superior Court set her trial for March 8, 2004. On February 26, 2004, approximately a week before trial, the State provided the defense a "two and one-half inches thick" notebook of documents with "both exculpatory and potential inculpatory information." Within this voluminous set of documents was a handwritten statement by Mellisa taking issue with Brown's "truthful" proffer. This development compelled Linda's counsel, who had already cleared a four-week period from their calendars,[5] to request a continuance. The trial judge granted the request and set a new trial date of March 22, 2004.

Twelve days before opening statements, the State filed a "potential" witness list which included both Brown and Mellisa as witnesses whom the State would call. Therefore, almost one year before the sole remaining codefendant's trial began, the State had openly and publicly represented to the Superior Court that Brown had agreed to plead guilty and to testify truthfully and consistently with a written proffer accepted by the State and disclosed to the Superior Court about the crimes for which Linda was to be tried. Six months before Linda's trial was to begin, the State had accepted Mellisa's plea, the proffer on which it was based, and her agreement to testify truthfully about the crimes for which Linda, the sole remaining codefendant, would be tried before a jury.

Although the State generally has no obligation to disclose its trial witnesses, its

---

**5.** Defense counsel was reluctant to make the request but felt they had no other option. A day before the request for the continuance, defense counsel, in a letter to the trial judge, stated:

> We do not know why the last set of documents took until February 18 to get into the hands of the police. They were identified at least by December 17. Whatever the reason for the late disclosure, the defense has been placed in an untenable position. It will be impossible to fully review and analyze the documents in question. Of course, the effect of this is magnified in a capital case.
>
> [My co-counsel] and I plan to meet with Ms. Charbonneau tomorrow at Baylor Women's Prison. Obviously, we plan to discuss the issue with her. We will be discussing that a request for a continuance be made, and will notify the Court as soon as a final decision is made. It is with great reluctance that any request for a continuance be made. We all understand the commitment the Court and the prosecution have made to move this case to trial. From defense counsel's perspective we have already cleared a four week period from our calendars which could never be appropriately refilled at this date. However, our commitment to our client requires this letter and any subsequent request.

plea agreements with Brown and Mellisa renders that point irrelevant as to them, because a key condition of the pleas was that both witnesses would: (a) testify; and, (b) testify truthfully. The State so represented to the Superior Court in open court at the time of their pleas—one year before and six months before, Linda's trial was to begin. Defense counsel knew the terms of the pleas and, therefore, reasonably could expect, in the absence of State action to the contrary that Brown and Mellisa would testify. Under these circumstances, defense counsels' reasonable reliance on their expectation that Brown would be called was buttressed by the State's failure to give timely notice that he would not be called, despite months to do so. Defense counsel and the trial judge had no reason to believe that because the prosecutors questioned Brown's veracity, they were not going to call Brown. The State's list of potential witnesses for *voir dire* purposes, did not, as the dissent points out, obligate the State to call all those listed, but the list, coming only twelve days before opening statements confirmed the reasonableness of defense counsels' expectation. The State further exacerbated its forthcoming self-made "ethical dilemma" by not revoking Brown's plea agreement during the six months prosecutors knew that Brown and Mellisa could not both be expected to "testify truthfully."

The case began with jury selection on March 22, 2004. Four days into jury selection and four days before the scheduled opening statements, the prosecutors requested a conference with the trial judge.[6] At that conference the prosecutors, for the first time, disclosed an "ethical dilemma." [7] Specifically, the prosecutors professed that they believed Brown was lying about Sproates's murder. The prosecutors told the trial judge that they did not believe Brown because they credited Mellisa's statement that she was miles away when the murder occurred. In other words, the prosecutors, taking upon themselves the jury's fact finding prerogative, found Mellisa to be the more credible witness.[8] According to the State, the "ethical dilemma" resulting from their belief left the prosecutors with few viable options: (i) call Brown and "ask him about [John's] death and maybe either don't ask him anything about the Sproates death or just ask him a general question, 'Did you participate in the killing and transportation of the body and burial of Sproates?,' and sit down and let the defense have at him," or (ii) not call Brown at all.[9] The State ultimately decided not to call Brown, despite having listed him as a potential witness twelve days before opening statements were to begin and despite having waited until four days before scheduled opening statements to disclose its so-called "ethical dilemma."

6. The prosecutors requested a conference on *Thursday* March 25, 2004. The Superior Court had scheduled opening statements to begin on *Monday* March 29, 2004.

7. The State claims that it was obvious that they believed Brown was lying about Sproates because they allowed Mellisa to plead guilty to a Conspiracy charge alone. Mellisa entered her plea approximately six months before Linda's trial. Thus, the State knew or should have known of its "ethical dilemma" at least six months before characterizing it as

such. Inexplicably the dilemma remained obscured, since the State included Brown on its potential witness list on March 17, 2004.

8. The prosecutors stated "[i]t is, on the one hand, I think obvious to everybody concerned that we believe Mellisa Rucinski because we allowed her to plead basically to the murder count involving Charbonneau and conspiracy on Sproates."

9. A–56.

Linda's counsel had reasonably relied upon the State's representations that it would call Brown as a witness, and upon their knowledge that for at least six months before trial the State had known of Brown's and Mellisa's inconsistent statements yet had taken no action. Accordingly, Linda's counsel sought a missing witness instruction and an order admitting Brown's plea and proffer into evidence. Indeed, defense counsel had prepared for months based on the reasonable assumption that Brown would be called as a witness and that there were inconsistencies in Mellisa's and Brown's proffers that defense counsel would be able to exploit at trial. Linda's counsel sought to use the proffered facts supporting Brown's plea to "test Ms. Rucinski's credibility and to support an argument that the State does not have confidence in the strength of its case." [10]

Rejecting Linda's counsels' position, the trial judge declined to admit Brown's plea and proffer into evidence, holding that any probative value of Brown's plea agreement was substantially outweighed by "unfair prejudice, confusion of the issues, or misleading the jury, and also by considerations of waste of time." The trial judge reserved ruling on the missing witness instruction. Because the ruling on Linda's motion *in limine* excluded evidence of Brown's plea and the facts supporting his proffer, Linda's counsel was precluded from presenting the theory they had spent months developing—that the inconsistencies in Mellisa's and Brown's proffers created a reasonable doubt about Linda's guilt, because the State's key witnesses could not agree on the details of their own involvement in the murders.

Mellisa testified as the State's primary witness. Her testimony provided a substantially uncontradicted basis for the jury to convict Linda on all counts.[11] After a penalty hearing, the trial judge sentenced Linda to death by lethal injection for the murders of John and Sproates.

## II. THE SIX CLAIMS OF ERROR

We turn next to Linda's six claims of error.

### A. *The Trial Judge's Refusal to Admit Brown's Plea and Proffer*

As earlier noted, four days before opening statements were scheduled and four days into jury selection, the prosecutors notified the trial judge that they would not call Brown. Understanding that Brown would likely assert his Fifth Amendment right against self-incrimination if they called him, Linda's counsel sought a ruling admitting into evidence the fact that Brown had pleaded guilty to two counts of First Degree Murder and the facts proffered by Brown as part of his plea bargain. The defense sought a ruling admitting the plea and proffer before trial, because counsel wanted to tell the jury in their opening statement that Brown's and Mellisa's proffers were inconsistent and would, therefore, create a reasonable doubt about Linda's guilt. Defense counsel also desired to admit Brown's plea and proffer in order to enable the jury to compare both versions of the murders in judging Mellisa's credibility.

Citing *Potts v. State*,[12] the State opposed the application, claiming that the facts of Brown's guilty plea and the facts supporting Brown's proffer were not admissible,

10. A–124

11. Linda was convicted of two counts of First Degree Murder, two counts of Conspiracy in

the First Degree, and Possession of a Deadly Weapon During the Commission of a Felony.

12. 458 A.2d 1165 (Del.1983).

because they were not relevant to Linda's guilt or innocence. Relying on *Potts*, the trial judge ruled Brown's proffer and the fact of his plea irrelevant because "an accomplice plea does not exonerate a codefendant."[13] Citing *Johnson v. State*[14] the trial judge also held that the admission of a codefendant's guilty plea and proffer is governed by Delaware Rule of Evidence 403.[15] Applying D.R.E. 403, the trial judge concluded that any probative value of the fact of Brown's plea and the facts proffered in support thereof was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or wasting time.

 Linda has appealed these evidentiary rulings. Because a determination of whether evidence is relevant falls within the discretion of the trial judge, we will not reverse a trial judge's decision absent a clear abuse of discretion.[16] Similarly, because the trial judge has discretion to determine whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or wasting time,[17] we review that finding for abuse of discretion. Judicial

discretion is the exercise of judgment directed by conscience and reason. A trial judge has abused his discretion where the judge has exceeded the bounds of reason in view of the circumstances and has so ignored recognized rules of law or practice so as to produce injustice.[18]

Further, we have held that when:

... the appeal is grounded on allegations that the [trial judge] erred as a matter of law or abused [his] discretion in submitting claims to the jury and in admitting certain evidence, [we] will first consider whether the specific rulings at issue were correct. If [we] find error or abuse of discretion in the rulings, [we] must then determine whether the mistakes constituted significant prejudice so as to have denied the appellant a fair trial.[19]

 We hold that the trial judge abused his discretion by endorsing as fact the State's unilaterally held view that one witness's version of the facts, purportedly offered truthfully in support of a plea agreement accepted by the State, was credible, while another witness's version, similarly accepted by the State as truthful, was not.[20] Because that ruling overlaid the

13. A–147–48.

14. 604 A.2d 417 (1991).

15. A–148.

16. *Lampkins v. State*, 465 A.2d 785, 790(Del.1983).

17. *Williams v. State*, 494 A.2d 1237, 1241(Del.1985); *see also* D.R.E. 401, 402, 403.

18. *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968); *Larrimore v. Homeopathic Hospital Ass'n of Del.*, 181 A.2d 573, 578 (Del.1962); *Pitts v. White*, 109 A.2d 786, 788 (Del.1954).

19. *Strauss v. Biggs*, 525 A.2d 992, 997 (Del. 1987).

20. The defense argued in this appeal that Brown's statements are admissions of a party opponent under D.R. E 801(d)(2)(b). In other words, the defense argued that the State adopted a belief in the truth of Brown's plea by accepting it and not voiding the plea when it determined that Brown was lying. D.R.E. 801(d)(2)(b) is an exception to the hearsay exclusion. The trial judge did not exclude Brown's plea agreement on hearsay grounds. Brown's proffer and plea agreement were not hearsay in this case because the defense was not offering the plea for the truth of the matter asserted. The defense did not seek to offer Brown's plea into evidence to show that Brown's version of the murders was the truth. Instead, the defense sought to introduce Brown's plea so that it could attack the credibility of Mellisa's version of the murders. Thus, we need not address this argument.

trial judge's own personal endorsement of one proffered version over a different version and removed a critical credibility determination from the jury, it constituted error. These errors resulted in significant prejudice that is sufficient to undermine our confidence that the defendant received a fair trial.

Three issues are critical to the trial judge's ruling on the defendant's *in limine* motion: logical relevance; outweighing prejudice to the State, and prejudice to the defendant. We turn to those issues.

## 1. Relevance of Brown's plea and proffer

■ Under Delaware Rule of Evidence 401, the proffered evidence is relevant if it tends to make the existence of the defendant's guilt more or less probable.[21] In ruling the fact that Brown had pleaded guilty and the facts supporting Brown's proffer logically irrelevant, the trial judge relied on *Potts*, a case where the police raided the defendant's house pursuant to a search warrant. During the course of the search, the police arrested Potts and four of his companions, who were later indicted for the same drug charges: Possession with Intent to Deliver Heroin; Possession with Intent to Deliver Cocaine; Possession with Intent to Deliver Marijuana; Possession of Hypodermic Needles and Syringes; Maintaining a Dwelling for the Keeping of Controlled Substances; and Conspiracy

Second Degree. Before Potts's trial, two of his companions pleaded guilty to simple possession of drugs under a plea agreement with the State. Potts sought to admit his codefendants' pleas at his later trial on the basis that their statements were exculpatory because they corroborated his defense that the drugs seized did not belong to him. In other words, Potts sought to admit his codefendants' guilty pleas to possession of drugs to demonstrate that they—and not he—possessed the drugs. We agreed with the trial judge's conclusion that the relevance of the codefendants' pleas was tenuous at best. We stated:

> The two codefendants who entered guilty pleas did so only as to the charges against themselves. Defendant did not establish that his companions' pleas constituted confessions to exclusive possession of the drugs. Hence, their pleas were not shown to exculpate defendant.

In this case, the trial judge relied on *Potts*, stating:

> An accomplice being a person being charged to the same crimes with which a codefendant is charged, like a person in the position of Linda Charbonneau, is not relevant evidence. As our Supreme Court observed in *Potts* ... an accomplice plea does not exonerate a codefendant. The innocence or guilt of a defendant, or of a person in Ms. Charbonneau's position, must be settled

---

We need only determine whether the trial judge abused his discretion in finding that Brown's plea agreement was irrelevant and that the plea agreement's probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or wasting time.

Further, defense counsel argued that the trial judge's refusal to allow the defense to argue that the State used conflicting theories against codefendants charged with the same crime violated Linda's right to a fair trial.

The State properly characterizes the argument as a judicial estoppel argument. While we need not address the issue because we reverse on other grounds, it is worth noting that the State has maintained one theory against Linda—that she was the mastermind of the murders and elicited the help of Brown and Mellisa. This theory is discussed in more detail in Section II(D) of this opinion.

21. *Hoey v. State,* 689 A.2d 1177, 1180 (Del. 1997).

only on the evidence produced during the trial.

■ The trial judge's reading of *Potts* and his application of *Potts* to this case was misplaced. The trial judge concluded that *Potts* announced a categorical rule that an accomplice plea and proffered statements in support of the plea are always irrelevant because they do not exonerate a codefendant. We did not announce any such rule in *Potts*. In *Potts*, the defendant was attempting to establish, through the fact that his codefendants pleaded guilty, that he did not possess drugs. We held that the codefendants' pleas were irrelevant because they did not independently establish that the codefendants' *exclusively* possessed the drugs. That is, in *Potts*, the codefendants' guilty pleas did not make it more or less probable that the defendant also possessed drugs.

*Potts* is distinguishable from this case. Linda did not seek the admission of Brown's plea and proffer to exonerate herself by seeking to establish that Brown, and not she, committed the murders. Rather, Linda sought to introduce Brown's plea and proffer to "test Ms. Rucinski's credibility and to support an argument that the State does not have confidence in the strength of its case." [22]

We agree that Brown's plea to two counts of First Degree Murder for a deal on his penalty did not, alone and without more, impeach Mellisa. The mere fact that Brown pleaded guilty did not give Mellisa motive to lie. But, Brown's proffered statements in support of his plea were relevant to test Mellisa's credibility on the degree of Linda's involvement in the crimes with which Mellisa, Brown and Linda were charged.

The trial judge recognized that "the State had good reason to believe Brown put too much of a finger of blame on Linda Charbonneau to get himself out of trouble and was less than truthful." [23] What the trial judge apparently failed to apprehend, however, is that the jury, after hearing the inconsistencies in the State's witnesses' versions of the events, might conclude that Mellisa had a similar motive to implicate Linda falsely. Brown proffered that Mellisa was the primary actor in Sproates's death. Brown's proffered statements gave Mellisa a motive to lie and to implicate falsely her codefendants. Defense counsel wanted to use Brown's proffer to demonstrate to the jury that Mellisa had a motive to lie both in her proffer and in her live testimony.

The trial judge's refusal to credit the relevance of Brown's proffered statements to impeach Mellisa is best understood by focusing on the following question the trial judge posed to the defense:

> Brown has an axe to grind with Rucinski in falsely accusing her of killing Sproates. How does this automatically translate into some interest, bias, or prejudice of Mellisa Rucinski to falsely accuse Charbonneau? I'm asking the question because that's the question the defense is going to have to answer. [24]

That question illustrates that the trial judge did not understand how Brown's proffered statements could impeach Mellisa. The reason, in our view, is that the trial judge had unqualifiedly endorsed the State's contention that it was Brown—and not Mellisa—who was lying. We agree that if Brown lied, his statements would provide a motive for Mellisa to falsely implicate him but not necessarily Linda.

**22.** A–124

**23.** A–111–12.

**24.** A–155–56.

But, if Brown's proffered statements created a reasonable doubt in the jurors' minds about Mellisa's credibility generally, that doubt might also have affected the jury's analysis of the believability of Mellisa's version of Linda's involvement in the murders.

It was error for the trial judge to accept the State's contention (and essentially find as fact) that Brown (not Mellisa) was lying and then to remove that issue from the jury. The prosecutors argued two reasons why they believed Brown was lying: (1) his statements were substantially inconsistent with Mellisa's; and, (2) no DNA was found on the knife that Brown claimed Mellisa used in killing Sproates. These reasons alone could not justify the trial judge taking from the jury the issue of the credibility of Mellisa's testimony about Linda's involvement in the murder.

First, the fact that Brown's statements were inconsistent with Mellisa's could not, without more, justify concluding that Brown was lying. The State itself acknowledged that "there are always inconsistencies in people's statements."[25] Further, the State and the trial judge both knew Mellisa was an admitted liar. At trial she admitted lying at every opportunity she had to speak about the case.[26] Certainly one could not reasonably conclude that Brown's statements were false solely because they were inconsistent with statements from someone who openly admitted she herself was a liar.

Therefore, the trial judge was left with the argument that there was no DNA on a knife that Brown alleged Mellisa used to stab Sproates. But, to conclude that Brown must have been lying simply because there was no DNA on the knife is misguided. The absence of DNA on the knife can be explained by any number of circumstances—including the possibility that someone cleaned the knife after the murder.[27] Thus, we hold that the trial judge abused his discretion by accepting, as fact, the State's contention that Brown was lying but that Mellisa was truthful and by removing from the jury the issue of who spoke truthfully and whether the inconsistencies resulting raised a reasonable doubt about Linda's guilt.

Mellisa provided all of the testimony necessary to convict Linda. Because Mellisa's testimony was the linchpin of the State's case, we cannot be confident that any evidence that could impeach Mellisa's credibility would not create a reasonable doubt about Linda's guilt.

Because the jury might possibly believe Brown, Brown's proffered statements would be relevant to test Mellisa's credibil-

---

25. A–55.

26. *See* A–362. Mellisa Rucinski testified:
 Q. Now do you remember when I started my examination of you, I ask you—you said you lied to the police in their investigation, you lied in your proffer, you lied in the statement following the proffer, and you lied on the stand, and you admitted to me that you lied in the investigation, but you denied the other three; do you recall that yesterday when I asked you that?
 A. Yes.
 Q. So now you are changing that story and telling us: Yes, you lied all four times

that you had an opportunity to speak about this case; is that correct?
 A. Yes.

27. We recognize that Brown contends Mellisa used a pocket knife when she allegedly stabbed Sproates and that to remove DNA from a pocket knife one probably would have had to disassemble the knife and remove any blood from inside the handle. We do not contend that the knife was actually cleaned in this manner, but merely use it as an illustration of why the trial judge should have not accepted the State's contention that Brown was lying simply because no DNA was found on the knife.

ity. In his proffer, Brown heavily implicated Mellisa. Brown claimed that Mellisa assisted in John's burial, and actively participated in Sproates's murder. The State itself, armed with Brown's statements that were posited as truthful, leveraged a deal with Mellisa. Surely the State suggested to Mellisa that she was facing First Degree Murder charges and a possible death sentence if a jury believed Brown's proffered statements. Motivated to ensure that she received a favorable plea bargain and to avoid a possible death sentence based on Brown's statements, Mellisa had an interest in falsely implicating either or both of her codefendants and in exculpating herself. Brown's proffered statements were clearly relevant to challenge Mellisa's truthfulness when she gave testimony implicating Linda. The trial judge erred in holding otherwise.

## 2. Whether the Probative Value of Brown's Proffer was Substantially Outweighed by the Danger of Unfair Prejudice.

The logical relevance of Brown's guilty plea and proffer does not conclude the analysis. A trial judge may exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." [28] As discussed above, we review for an abuse of discretion a trial judge's ruling under D.R.E. 403 for an abuse of discretion.[29]

■ Here, the trial judge found that any probative value of Brown's proffer was substantially outweighed by the danger of

unfair prejudice, confusion of the issues, misleading the jury, or wasting time.[30] The trial judge stated:

Brown's plea agreement would likely poison the well for Linda Charbonneau as a jury would view the case as closed. The jury's focus must be solely on the evidence, and there would be a great deal of time wasted to explore matters.[31]

In so holding, the trial judge abused his discretion. Brown's proffered statements were highly probative. Mellisa was the State's primary witness who provided the testimony that enabled the jury to find her mother guilty of two intentional murders. Any evidence that would operate to impeach Mellisa's credibility had probative value. If the jury found Mellisa's testimony generally incredible, then Linda would have had an opportunity to create a reasonable doubt in the jurors' minds about the extent of her own involvement in the crimes charged.

The trial judge held, however, that the jury would have viewed the "case as closed" if Brown's plea and proffered statements were admitted. We interpret that view to mean that if the jury was told that Brown had pleaded guilty to two counts of First Degree Murder and if the jury had accepted the facts underlying Brown's proffer, the jurors would have concluded that Linda was guilty of two intentional murders. We do not agree. The State's theory, which the jury understood, was that Linda, Mellisa, and Brown all committed the murders. Both Brown and Mellisa's statements implicated themselves, each other, and Linda to some degree. Admitting Brown's proffered statements, certainly would not give the jury

---

**28.** D.R.E. 403.

**29.** *Williams,* 494 A.2d at 1241; *see also* D.R.E. 403.

**30.** A–148.

**31.** A–149.

any indication that the "case (against Linda) was closed." The trial judge should have admitted the proffered statements.

Thus, we hold that the trial judge abused his discretion by holding that the probative value of the Brown statement was outweighed by the prejudice that evidence would occasion to Linda (on the theory it would "close" the case against her) or that it would be a waste of time to explore the inconsistency in the testimony of two eyewitnesses to two intentional murders. There certainly, on the other hand, was no cognizable prejudice to the State in admitting statements that the State itself had procured as part of its plea bargain and that, by not rescinding its plea bargain with Brown, continued impliedly to endorse.

### 3. Prejudice to the Defendant From Failure to Admit Brown's Plea and Proffer.

█ As discussed above, "if the court finds error or abuse of discretion in the rulings, it must then determine whether the mistakes constituted significant prejudice so as to have denied the appellant a fair trial."[32] We hold that the trial judge's refusal to admit Brown's proffered guilty plea and statements constituted prejudice so significant that it denied Linda a fair trial.

As noted, Mellisa's testimony was the linchpin of the State's case. She provided the State with all of the evidence necessary to convict her mother. Surely Mellisa's testimony, if not contradicted by any other eyewitness, would strongly influence a jury, since Mellisa was implicating her own mother in two intentional murders. By the same logic, any facts that would

test Mellisa's credibility could also significantly impact the outcome of the case. Because Brown's proffered statement gave Mellisa a motive to lie, that statement should have been admitted to impeach Mellisa's credibility. Because it was not, the jury's inability to assess Brown's proffered statements to support his plea, and the inconsistencies they created for the State's case, denied her a fair trial.

Moreover, the State's tactics exacerbated the prejudice to Linda. The State accepted Brown's plea in April of 2003. Six months later, in October of 2003, the State accepted Mellisa's plea—a time that the State concedes its prosecutors believed Brown was lying.[33] At the time that Mellisa entered her guilty plea—six months before Linda's trial—the State's prosecutors could have notified the defense and the trial judge of their "ethical dilemma," but they did not. Instead, the State included Brown on its potential witness list for *voir dire* twelve days before opening statements, and waited until four days before the scheduled opening statements before disclosing the "ethical dilemma."

The dissent seems to suggest that Linda's plight at this point is no different than that of any codefendant who the State and Superior Court agree to try first. We disagree. Here, both of Linda's codefendants pleaded guilty and were not going to have a trial because each had made a deal in open court to testify truthfully against Linda. When the prosecutors' stated they would not be calling Brown, the trial judge *sua sponte* should have asked, "are you revoking Brown's plea agreement? If not, I will sentence Brown now and the defense can call Brown." Defense counsel had no

---

32. *Strauss,* 525 A.2d at 997.

33. The prosecutor stated: "[i]t is, on the one hand, I think obvious to everybody concerned that we believe Mellisa Rucinski because we

allowed her to plead basically to the murder count involving Charbonneau and conspiracy on Sproates."

"ethical dilemma" because they were not presenting Brown's statements for their truth—just the opposite. Defense counsel wanted to show Brown's version's inconsistency with Mellisa's version and demonstrate that neither were credible.

This case is, we think, unique because the trial judge allowed the State's tactical trial decisions to control Brown's sentencing date—whether the State called him or not—which in turn gave the State control over Brown's availability to both the State and to the defense.[34] Any experienced trial attorney would quickly grasp the significant prejudice resulting from the State's timing. Defense counsel reasonably believed that the State would call both Brown and Mellisa to testify in accordance with the terms of their respective public plea agreements and the State's representations to the Superior Court at the time of the pleas, and in reliance on that belief, defense counsel based their theory of Linda's defense on the inconsistencies between Brown's and Mellisa's proffers. The State's strategy of waiting until the thirteenth hour to disclose its "ethical dilemma" forced defense counsel to reformulate their entire trial strategy which they had spent six months preparing, four days before opening statements.

Brown became unavailable to the defendant because Linda called him as a witness and he asserted his Fifth Amendment right. But Brown was always available to the State. The State had entered into an agreement with Brown that required Brown to testify if called by the State as a witness at the trial. If the State pursued its agreement to call Brown, he would have been required to testify pursuant to his plea agreement. If Brown refused to testify for the State and thereby breached the plea agreement, the State could have revoked its plea agreement with Brown.

In this case, Brown remained unavailable to the defense because the State did not decide to honor its plea agreement with Brown until after Charbonneau's trial, even though the State had already concluded Brown's statements at the time of the plea agreement were untruthful. If

---

34. When the State admittedly realized six months before trial that either Brown, Mellisa or both lied in their proffers supporting their pleas and their promises to testify truthfully, the State knew that if it failed to revoke Brown's plea agreement and decided not to call Brown that he would, if called by the defense exercise his Fifth Amendment right to refuse to testify. The State's representation to Brown's counsel that if Brown did so refuse to testify that the State would still honor its promise to recommend life imprisonment for an habitual offender who admitted to two intentional murders seals any reservation about the State's tactics. The State's plan was designed to prevent the defense from introducing Brown's live testimony or putting his written proffer in evidence.

MR. CALLOWAY (quote from trial):
As the Court is aware, Mr. Brown entered those pleas to murder in the first degree and capital homicide. A part of our agreement was that Mr. Brown would testify truthfully. The State would not be seeking a death penalty hearing in this matter, that the Court would then be permitted to sentence Mr. Brown to life without parole.

There was a discussion concerning whether or not he would or would not testify as a defense witness. It was determined and represented to the defense by the prosecution that Mr. Brown certainly would have his Fifth Amendment rights, irregardless (sic) of any agreement, and that if Mr. Brown were to exercise his Fifth Amendment rights, as a witness for the defense, that would not be a violation of our written agreement.
See B–148.
Even if Calloway's view of what the State promised was disputed by the State, the State's professed stalemate over what to do with Brown "subject to a discuss[ion] with our superiors" lacks credibility given the six months before trial during which all the necessary discussions with the presumably elusive "superiors" could have been held.

the State had immediately announced that it was not calling Brown as a witness but was nevertheless going to honor his plea agreement, Brown could have been sentenced promptly and would then have been available to testify for the defense at trial because Brown would no longer have been able to invoke his Fifth Amendment right not to testify. Consequently, the State's unilateral decisions not to call Brown as a witness and not to make a decision about honoring Brown's plea agreement until after Charbonneau's trial resulted in Brown's unavailability as a witness for the defense.[35]

Not surprisingly, defense counsels' motion *in limine* sought relief from the trial judge, most relevantly, an order admitting Brown's plea and proffer in order to impeach Mellisa and create reasonable doubt about the State's case. By denying that requested relief, the trial judge forced Linda to go to trial without the benefit of the strategy her counsel had spent months developing. For these reasons, the trial judge's erroneous exclusion of Brown's proffered statements denied Linda her right to a fair trial.[36]

As earlier discussed, the crux of the defense strategy, which Linda's defense counsel spent months preparing, was to cross-examine Brown and Mellisa to highlight to the jury the inconsistencies between the stories of both witnesses. Defense counsel believed that those inconsistencies might show that both witnesses were lying and create a reasonable doubt in the jurors' minds about the extent of Linda's involvement. Defense counsel would also have been able to argue that the State had no firm view how the murders occurred because its own witnesses had given different accounts of the murders. Put simply, the defense could have argued that the State had no coherent theory about Linda's involvement.

The State's chosen tactic—waiting until only four days before opening statements to announce that the prosecution would not be calling Brown—eviscerated that defense strategy and, because of its timing, did so unfairly. As previously held, the trial judge should not have allowed that to occur, but failing that, should have granted the relief Linda had requested in her motion *in limine* to preserve her ability to conduct a defense.

---

**35.** The State's trial tactics here raise serious doubts about the foundation of the prosecutors' purported concerns. The State's prosecutors argued that they could not call Brown as a witness because they believed he was lying. Despite believing that Brown was lying six months before the defendant's trial, the prosecutors waited until four days before scheduled opening statements to disclose that they would not be calling Brown. Further, they appear to have convinced the trial judge that while Brown must be lying about Sproates, he must be telling the truth about Linda. Otherwise the trial judge would not have been so concerned about the case being "closed" against Linda should the jury hear the facts supporting Brown's proffer.

**36.** While we hold the trial judge abused his discretion, we do recognize the short period of time the trial judge had to make a ruling. The State, by waiting until four days before scheduled opening statements to disclose its dilemma, forced the trial judge into a very difficult position. Fortunately we have had ample time to review the entire record and all relevant aspects of the law in order to shape an appropriate remedy. Had the State disclosed its "ethical dilemma" at the time it believed Brown was lying and made a timely decision not to call Brown or revoked the plea agreement or moved for Brown's immediate sentencing, today's result may have been different. Had the State disclosed its dilemma even at the time of Mellisa's plea, the trial judge would have had six months to determine a remedy fair to both the State and Linda.

#### 4. Brown's Guilty Plea and Proffer Admissible Under D.R.E. 804(b)(3).

■ Brown's guilty plea and proffer were admissible under Delaware Rule of Evidence 804 as declarations against penal interest that were made by an unavailable witness.[37] D.R.E. 804(b)(3) provides:

> 3. Statement against interest. A statement which was, at the time of its making, so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Such a statement is admissible if the witness is "unavailable." D.R.E. 804(a)(1) states that a declarant is unavailable who "is exempted by ruling of the Court on the ground of privilege from testifying concerning the subject matter of the declarant's statement." The State frequently invokes the "declaration against penal interest" exception to the hearsay rule as a basis for introducing statements by a non-testifying co-defendant who has asserted a Fifth Amendment right and is, therefore, unavailable.[38]

■ In this case, the trial judge ruled that Brown was entitled to assert his Fifth Amendment privilege against self-incrimination.[39] Therefore, Brown was unavailable within the meaning of D.R.E. 804(a)(1) and Linda's attorneys were entitled to introduce Brown's guilty plea agreement and proffer under D.R.E. 804(b)(3), the hearsay exception for statements against penal interest. To be admissible, Rule 804(b)(3) requires the statement to be made at a time when it was "so far contrary to the declarant's best interests that a reasonable person would not make the statement unless the declarant believed it to be true,"[40] e.g., a guilty plea to murder. Once that determination is made, the inquiry ends unless the statement would simultaneously expose the declarant to criminal liability and exculpate the accused.[41]

In this case, that should have been the end of the trial judge's inquiry because Brown's statements did not exculpate Linda. The State's action resulted in the guilty plea agreement and Brown's proffer. The State alone could compel Brown to testify at trial. When the State refused to call Brown as a witness and the trial judge permitted Brown to assert his Fifth Amendment right not to testify for the defense, Linda's motion *in limine* should have been granted. It was reversible error not to admit Brown's plea agreement and proffer into evidence under D.R.E. 804(b)(3) as declarations against penal interest made by an unavailable witness.[42] The trial judge's ruling denied Linda's

---

**37.** *United States v. Dolah*, 245 F.3d 98 105 (2d Cir.2001).

**38.** *Swan v. State*, 820 A.2d 342 (Del.2003).

**39.** *See United States v. Salerno*, 937 F.2d 797, 805 (1991).

**40.** *U.S. v. Bahadar*, 954 F.2d 821, 829 (2nd Cir.1992). *See Smith v. State*, 647 A.2d 1083

(Del.1994) and *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

**41.** *Id.*

**42.** *Smith v. State*, 647 A.2d 1083 (Del.1994) and *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

right to a fair trial and the effective assistance of counsel that are guaranteed by the Sixth Amendment of the United States Constitution.

## B. *The Testimony of John Rucinski*

Linda also claims that the trial judge erred by admitting the testimony of John Rucinski [43] whom the State called to testify about a conversation that he had with Mellisa about Linda's plan to kill John and a later conversation that John Rucinski had with Linda on the same subject.[44] The defense claimed that statements attributed by John Rucinski to Mellisa during the conversation were hearsay that was inadmissible against Linda. The State countered by arguing that a hearsay exception, Delaware Rule of Evidence 801(d)(2)(E), applied. Accepting that argument, the trial judge ruled in favor of the State. Linda has appealed the trial judge's application of D.R.E. 801(d)(2)(E). A trial judge's evidentiary rulings are reviewed under an abuse of discretion standard.[45]

Under D.R.E. 801(d)(2)(E), a statement is not hearsay if made "by a coconspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court." The State argued, and the trial judge agreed, that a conspiracy existed between Mellisa and

Linda. Mellisa's statements to John Rucinski were in furtherance of the conspiracy. Indeed, Mellisa's statements were intended to solicit John Rucinski's involvement in the conspiracy. Linda claims that by finding that the State established, by a preponderance of the evidence, the existence of a conspiracy between the Linda and Mellisa, the trial judge abused his discretion.

The trial judge's ruling was based on the testimony of Officer Keith Collins and a lengthy *voir dire* examination of John Rucinski.[46] Collins testified that he went to John's Bridgeville residence on August 15, 2000 to help resolve a property dispute between Linda and John. Collins told the parties "if there was any kind of dispute as to who owned what, it had to stay in the house." Collins further testified that he witnessed Linda and Mellisa leave John's house in a van that was filled with possessions from the house.

On *voir dire*, John Rucinski testified that within a month after the property dispute, Mellisa approached him:

> Q. Prior to her(Linda Charbonneau) moving in, or after she moved in, in August or September 2000, did you ever have any discussions with your wife and/or Linda regarding John Charbonneau?

---

**43.** To avoid any confusion, we always refer to John Rucinski as "John Rucinski." Mellisa was married to John Rucinski until January of 2001.

**44.** The trial judge ruled that the defendant's statements to John Rucinski were admissible as admissions of a party opponent under Delaware Rule of Evidence 801(d)(2)(a). The defense has not challenged the admissibility of the defendant's statements to John Rucinski. Thus, we only need to address whether Mellisa's statements to John Rucinski were admissible.

**45.** *See Strauss,* 525 A.2d at 992.

**46.** John Rucinski's statements, which the defense argued were inadmissible, are partly what the trial judge relied upon in determining the existence of the conspiracy. The defense correctly acknowledges that the trial judge did not err by relying on the challenged statement to establish the existence of the conspiracy. In fact, we have held that an 801(d)(2) statement itself can establish the existence of the conspiracy. *See Swan v. State,* 820 A.2d 342 (Del.2003).

A. Yes. My wife I had—I came home from work and usual thing. We—it was about bed time. I was in bed. Had brought John Junior in, put him down to sleep. Got in bed. She had asked me if I would listen to something she had to say. She wanted—I am taking a guess she wanted my opinion on it, or I'm not sure exactly what her meaning of what the conversation was, but she told me that her and **her mother had been talking about forcing John into a heart attack** by taking away his pills, and you know, from like he said forcing him into a heart attack, putting him in a plastic tote, burying him in the backyard, so that she could get all of his stuff out of the house, and so she could have the house on top of that because she was afraid that if something ever happened to John she would get nothing.

Q. You say "she," who are you referring to?

A. Linda

Q. Missy(Mellisa) was telling you this?

A. Missy was telling me this. My exact words well that it is a little more than I wanted to know about that situation and that you know I told Missy as long as she was with me, we would have no part in that, and then I mentioned something to Linda that night about it, and we talked more about it the next morning.

John Rucinski testified that the next day he had a similar discussion with Linda about killing John.

Q. What happened after that? There wasn't really much said about it in the morning. Came home that evening, came from work, the kids were all put to bed, sat out in the living room and talked about—I told her(Linda) what Missy had told me. She(Linda) told me

that **that was just like one of the scenarios.**

Court: You have to be real clear when you say "she."

A. Linda.

Court: You have to be clear. I want to be certain the record is clear.

A. Okay. Me and Linda talked. Linda said that was just one of the scenarios. Another one was ⁻

Q. That was just one scenario?

A. That, hiding his pills and forcing him into having a heart attack was just one of the scenarios. The other one was faking a break-in, but she said she still might lose what was in the house, and I plain out told her that I don't know if she was trying to solicit me into this or she wanted my opinion or what. But I did tell her that I would have no part of that, and I did tell her that—I said that you know if you did do anything like this, the first person they are going to look at is you and me because of my record.

■ We hold that the trial judge did not abuse his discretion by admitting the above testimony of John Rucinski and Collins. The State presented purely circumstantial evidence about the conspiracy between Linda and Mellisa. We draw no distinction, however, between circumstantial and direct evidence.[47]

The circumstantial evidence could lead a reasonable juror to conclude that Linda and Mellisa, in August of 2000, had the common purpose and design to kill John. Linda and John had a property dispute, shortly after which, Mellisa approached John Rucinski and told him of her discussions with Linda about killing John and burying him in the backyard. The day after his discussion with Mellisa, John Ru-

**47.** *Monroe v. State,* 652 A.2d 560, 563 (Del. 1995).

cinski asked Linda about what Mellisa had said to him. Linda acknowledged that she and Mellisa had discussed, as "just one of the scenarios," killing John by taking away his pills. From the fact that Linda and Mellisa had discussions with each other, and with John Rucinski, about killing John, a fact finder could infer that it was more likely than not that Linda and Mellisa had conspired to kill John. Thus, the trial judge did not abuse his discretion by admitting Mellisa's statements to John Rucinski under D.R.E 801(d)(2)(E).

## C. Motion for Judgment of Acquittal

■■■ Linda also appeals from the trial judge's denial of her Motion for a Judgment of Acquittal. Linda contends that: (1) the evidence presented supported only a "rage killing" by Brown, and that (2) the State violated Linda's due process rights by advancing different theories in Brown's and Mellisa's proceedings. We review a denial of a defendant's motion for judgment of acquittal de novo.[48] The test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[49]

■■■ We hold that there was sufficient evidence to support the State's theory that Linda, Mellisa, and Brown conspired and developed a plan to kill John and Sproates, and to support a jury finding that the conspiracy existed beyond a reasonable doubt.

The evidence showed that Linda had a motive to kill John: throughout their relationship there were disputes concerning grandchildren, money, and material items. The State established that during their

dysfunctional relationship, Linda was developing a plan to murder John. John Rucinski's testimony established that Mellisa approached him to request his help in a plan to kill John. Mellisa told John Rucinski that her mother had spoken with her about inducing John to have a heart attack. John Rucinski also testified that he asked Linda what Mellisa had told him, and that Linda had confirmed she said that inducing a heart attack was "one of the scenarios." John Rucinski told both Mellisa and Linda that he would have no part in John's killing.

The State presented evidence that Mellisa and John Rucinski eventually divorced and that Mellisa met Tony Brown over the internet during the summer of 2001. Brown, an African American,[50] began dating Mellisa. During that same period, the tensions underlying the relationship between Linda and John had escalated. Arguments ensued about John's alleged abuse of his granddaughter and a visit by the Division of Family Services to John's house investigating that alleged abuse. The evidence also established that John and Linda had an argument over a lawn ornament just before John's death.

Mellisa testified about the events that occurred on the night of John's murder. Mellisa testified that Brown followed her to John's Bridgeville residence. Mellisa went into the house, and several minutes later she heard Linda say to John "someone is breaking in the house." Mellisa then witnessed Brown beating John, and then placing John in a van. Mellisa drove Brown and John to a secluded area where Brown killed John and buried him. On the drive back, Brown called Linda to report that everything was done. By the

48. See Davis v. State, 453 A.2d 802 (Del.1982).

49. Id.

50. The State presented evidence that John and Sproates disliked Brown because of his race.

time Mellisa and Brown returned, Linda had cleaned the residence.

The State also presented evidence that the participants developed as a cover story that John was away on vacation or on jury duty. To support the cover story, Linda had her son dispose of John's car. Linda then stripped John's residence "to the bone," taking things such as the kitchen cabinets, floors, and outdoor fences.

The evidence further revealed that at the time Linda was moving all of John's property to Sproates's Magnolia residence, Sproates became suspicious because John had mysteriously disappeared. Eventually, Sproates discovered a bloody box among the items that Linda had moved from John's home. Believing that box might be somehow related to John's disappearance, Sproates became even more suspicious. Sproates then began to show the bloody box to other people.

Linda told Mellisa and Brown that something had to be done about Sproates. The State presented evidence to show that is exactly what happened: Mellisa, Linda, and Brown coordinated Sproates's death. Mellisa testified that Linda lured Sproates to his Magnolia residence where Brown was lying in wait. Brown then killed Sproates [51] and drove Sproates's body to the Bridgeville residence. While Linda and Mellisa were present, Brown buried Sproates in the backyard. All three then developed a cover story that Sproates had run off with a younger woman.

Viewing the evidence in the light most favorable to the State, we hold that a reasonable jury, based on that evidence, could find Linda guilty as an accomplice to the murders of John and Sproates, and guilty of the accompanying charges of Possession of a Deadly Weapon During the Commission of a Felony and Conspiracy. A reasonable jury could also have found, based on the evidence, that John was "set up" for the kill by Mellisa and Linda, and that Brown was the killer. A reasonable jury could also have found that Mellisa, Linda, and Brown conspired to kill Sproates to silence him because Sproates had become suspicious about the circumstances surrounding John's disappearance.

■ In support of her motion for judgment of acquittal, Linda also argued that the State violated her due process rights by advancing different theories in Brown's and Mellisa's proceedings. Linda relied on a Ninth Circuit case *Thompson v. Calderon* [52]—in support of her argument that the prosecution cannot use inconsistent theories regarding the same crime to convict two defendants at separate trials. In *Calderon*, a prosecutor used irreconcilably inconsistent theories in prosecuting two codefendants. The codefendants, Leitch and Thompson, were both charged with murdering Ginger Fleischli. At a preliminary hearing,[53] the prosecutor argued that Leitch wanted Fleishli dead for having interfered with his attempts to reconcile with his wife, and that Leitch had solicited Thompson's help to commit the murder. At a preliminary hearing, the prosecutor represented that jailhouse informants would testify that Thomson had confessed

---

**51.** The State presented evidence at trial indicating that Brown killed Sproates. We base our decision on a motion for judgment of acquittal on the evidence produced at trial. However, it is worth noting, that Brown's proffer, which was not admitted into evidence, stated that it was Mellisa who had inflicted the fatal wounds that killed Sproates.

**52.** 120 F.3d 1045 (9th Cir.1997).

**53.** At the preliminary hearing, Thompson and Leitch were joined as codefendants.

to the killing, and that the jailhouse informants would testify that:

> Thompson had told him that on the night of the murder, he engaged in consensual sex with Fleischli. Then, when Leitch returned home, the two executed Leitch's plan, and killed Fleischli.

Months later, Leitch successfully moved to sever his trial from Thompson's trial. The State tried Thompson first. At Thompson's trial, the prosecutor used a totally inconsistent theory from that which had been advanced at the preliminary hearing, and did not call any of the jailhouse informants he had referred to at the preliminary hearing. Instead, the prosecution called other informants who testified that Thompson killed Fleischli after raping her because he feared that Fleischli would call the police. Put simply, the prosecutor claimed that the motive for the murder was to cover up a rape. Moreover, the prosecutor argued that Thompson was the only one present when Fleischli was murdered. Thompson was convicted of the murder.

Later, at Leitch's trial, the prosecutor argued—inconsistently—that Leitch was the only person with a motive to kill Fleischli. Leitch's motive, the prosecutor claimed, was to prevent Fleischli from interfering with Leitch's attempts to reconcile his differences with his wife. Moreover, the prosecutor totally discredited any theory that Thompson committed the murder alone and argued that both men had committed the murder together. The court held that the prosecutor's use of inconsistent theories in different trials involving the same crime violated Thompson's right to a fair trial.[54]

The prosecutors did not engage in the tactics condemned in *Calderon*. The State's theory—that Linda masterminded the murders and elicited Brown's and Mellisa's help in her plan to kill John—never changed. Brown's and Mellisa's account of what occurred certainly differ with respect to who inflicted the fatal blows, but for purposes of a Motion for a Judgment of Acquittal, the State cannot fairly be said to have used inconsistent theories merely because these two witnesses gave different accounts of the murders. Indeed, Mellisa's and Brown's pleas suggest that the State had one theory. Although Brown stated that Linda had inflicted the fatal blows on John, and that Mellisa had inflicted the fatal blows on Sproates, the State obtained Brown's plea to two counts of First Degree Murder for the deaths of both John and Sproates. Brown's guilty plea is consistent with Mellisa's proffered statement that Brown had inflicted both John's and Sproates's fatal wounds. Further, Mellisa was permitted to plead to a conspiracy charge involving Sproates's death indicating that the State accepted her story about Sproates's death.

We hold that the trial judge did not err when he denied Linda's motion for judgment of acquittal.

### D. *Evidence of What Sproates Told his Relatives Before his Death*

 Linda next challenges the admission into evidence of several statements made by Sproates to his relatives several weeks before his death. The statements concerned Sproates's suspicion about John's disappearance.[55] Sproates told his relatives, among other things, that: (1) Linda had brought a blood stained box

---

**54.** *Thompson*, 120 F.3d at 1059.

**55.** Sproates made statements to the following relatives: Jerriann Heath (*See* A–603–614 and A–567–602), Willard McCray(*See* A–868–873),

William Sproates, Jr.(*See* A662–674), Patricia Blanchfield (*See* A702–708), and Roger Layton (*See* A–751–759).

from John's Bridgeville residence, and that he (Sproates) was scared and concerned about John's disappearance;[56] (2) Linda told Sproates that "if he had said anything of what happened, that she would no longer talk to him and the same thing would happen to him as it did Uncle John;"[57] and, that (3) Linda had called and he was going to let her in his Magnolia residence.[58]

The trial judge admitted Sproates statements as hearsay exceptions under D.R.E. 803(3) and D.R.E. 804(b)(6). We review a trial judge's evidentiary rulings for an abuse of discretion.[59]

D.R.E. 803(3) provides that a statement is not hearsay if it is:

a statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.

Many of Sproates's statements admitted into evidence consisted of statements, attributed to Sproates, that he was afraid. The trial judge determined that:

the statements as to mind as expressed to the witness are relevant, material, reflecting a mental state when made, were communicated in a natural manner, made under circumstances dispelling suspicion, and contained no suggestion of sinister motives.[60]

Sproates's statements asserted his current state of mind—fear of Linda.

Sproates's statements were relevant and material because they were circumstantial evidence of Linda's motive to conspire with Mellisa and Brown to commit murder. There was no evidence to suggest, nor does Linda claim, that the statements were made in an unnatural manner or unusual circumstance. Thus, we hold that the trial judge did not abuse his discretion by admitting Sproates's statements that he was afraid.

Linda claims, however, that many of the statements admitted into evidence were not probative of Sproates's then existing state of mind and are therefore not admissible. That is incorrect. Although some of the Sproates's statements do not reflect his then existing state of mind, the trial judge correctly ruled that the statements were admissible under D.R.E. 804(b)(6). Rule 804(b)(6) provides that "a statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not hearsay.

In applying D.R.E. 804(b)(6), the trial judge found that Linda (i) was involved in killing Sproates as a coconspirator and an aider and abetter, and (ii) Linda acted with the intent of procuring Sproates's unavailability as a potential witness at any trial concerning John's murder. The trial judge did not abuse his discretion in so finding.

The evidence showed that Sproates had seen bloody boxes that Linda brought from Bridgeville to Magnolia. Linda told Sproates to keep his mouth shut or he would "get what his uncle got." Sproates

---

56. A604–607, 611, 665–667, 705–707, 754–759, 869–870.

57. A–633.

58. A–672–673.

59. *Barnes v. State*, 858 A.2d 942, 944 (Del. 2004).

60. A–89.

told his family members and Roger Layton about the boxes. Layton was an experienced police officer who also saw blood on the boxes that appeared consistent with major trauma.

Linda learned from her son, Willard McCrea, that Sproates was actively involved in questioning John's disappearance and showing the bloody boxes to others. Linda then decided, with Mellisa and Brown, to kill Sproates. Linda told them that Sproates "was getting to close to finding out what had actually happened to dad, and something had to be done with him." [61] Mellisa testified that she understood that meant killing Sproates. The evidence showed that Linda lured Sproates to his Magnolia residence where Brown murdered him.

Based on this evidence, it was within the trial judge's discretion to find that Linda had participated in Sproates's killing in order to make him unavailable as a witness. Thus, Sproates's statements to his relatives that were both relevant and passed a D.R.E. 403 balancing analysis, were admissible as probative of Sproates's fear of impending harm under D.R.E 804(b)(6). [62]

### E. *Access to Juror Information*

■ Linda's final claim is that her due process rights were violated because the State had access to the jurors' criminal records, and that the trial judge improperly applied 11 Del. C. § 8513(g) to bar her equal access. [63] The defendant does not claim that she should have access to the information. Rather, her claim is that if she cannot have access, then neither should the State.

We cannot find that Linda's due process rights were violated on this theory. Linda has articulated no prejudice resulting from the State's exclusive possession of the information. As a defendant, Linda was entitled to request that voir dire questions be directed to jurors to determine the extent of any juror's involvement in past crimes. [64] That opportunity, if exercised, would negate any prejudicial effect of the State having exclusive access to that information.

### F. *A Comment on the Dissent*

We respectfully disagree with the dissent's summary of the record. We acknowledge that the State's timing of its revelation that it did not intend to call Brown and the fact that its late tender of a discovery response caused the defense to ask for a continuance complicated the issues for the trial judge. Nevertheless, this is not a case where the trial judge's exercise of his 403 discretion properly protected Linda from the efforts of her mis-

---

**61.** A–258

**62.** The trial judge did not abuse his discretion in determining what evidence was relevant. Further, the trial judge properly weighed the probative value of Sproates's statements against any danger of unfair prejudice. *See* A72–89.

**63.** 11 Del. C. § 8513 provides:

Notwithstanding any law or court rule to the contrary, the dissemination to the defendant or defense attorney in a criminal case of criminal history record information pertaining to any juror in such case is prohibited. For the purposes of this subsec-

tion, "juror" includes any person who has received notice or summons to appear for jury service. This subsection shall not prohibit the disclosure of such information as may be necessary to investigate misconduct by any juror.

**64.** *See* 86 A.L.R.3d 571 (stating "the traditional common-law rule that, absent a statute or rule of practice providing otherwise, or other exceptional circumstances, defense counsel in a criminal case has no right of access to information in the possession of the prosecution").

guided defense counsel. This is a case where the trial judge denied Linda's constitutional right to present her defense theory with the effective assistance of counsel.

The dissent states that "the trial judge allowed the credibility of the witnesses to be determined based upon fair cross-examination and evidence that would not be unfairly prejudicial to Linda Charbonneau."[65] Our reading of the record, however, reflects that defense counsel questioned Mellisa for a few minutes (representing about two pages of the record) about some of her disagreements with Brown's statements, *but the jury had no opportunity to see Brown's statements in context.* The record also reflects that the State continued to object to the use of Brown's proffer. The record reflects no circumstances, given the trial judge's rulings and the State's continuing objection, that would suggest that

the trial judge's initial ruling barring the proffer was tentative and subject to reconsideration.

The dissent's suggestion that the admission of Brown's proffer would result in a reversal, or subject defense counsel to denigration in a putatively successful post conviction relief petition, seems farfetched at best.[66] The proffer would have been introduced without objection, would have survived plain error scrutiny and, would have been admitted entirely consistent with sound defense strategy, and not subject to successful challenge by hindsight.[67]

■ The dissent avoids discussing *Potts* in support of its argument, but cites *Johnson v. State.*[68] Linda's attorneys properly distinguished *Johnson* in their memorandum to the trial judge. The standard for the defense using a *guilty plea* to establish the defendant's innocence was the issue in *Johnson,* but it is not the issue here.[69]

65. *See Infra* p. 53.

66. *See Infra* p. 56 n. 80.

67. *See e.g., Strickland v. Washington.,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("...[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.")

68. The dissent also cites *Allen v. State* [add citation to dissent] The facts in *Allen* are significantly different that the operative facts here. In *Allen,* the *State* wanted to use the plea or proffer of a non-testifying codefendant to establish *guilt.* As *Allen* explains, while that tactic is improper, the holding and analysis supporting it does not bar using the proffer for other purposes. Here, Brown's proffer should have been admitted for impeachment purposes with a limiting instruction.

69. The issue here was whether the State intentionally shielded Brown from testifying to gain a tactical advantage over the defense. While we found no cases discussing a prosecutor's unfair use of plea agreements to gain exclusive access to testimony, many cases discuss a prosecutor's unfair granting of testimonial immunity to gain access to favorable testimony and at the same time shield the defense from testimony unfavorable to the State. The State effectively accomplished the same unfair advantage here by manipulating its plea bargaining power to ensure that Mellisa would be heard but not Brown. Like using immunity in a one sided manner, use of plea agreements in a prejudicial manner can result in a basic unfairness that rises to the level of a violation of a defendant's due process rights. *See United States v. Dolah,* 245 F.3d 98 (2nd Cir.2001)(recognizing "in some limited circumstances, using the immunity device in a one-sided manner can result in a basic unfairness that rises to the level of a violation of procedural due process."); *Blissett v. Lefevre,* 924 F.2d 434, 442 (2nd Cir. 1991) (stating "only when a prosecutor has abused the government's ability to grant immunity by using it in a discriminatory fashion for the purpose of gaining a tactical advantage does due process require a grant of immunity for a defense witness."); *United States v. Turkish,* 623 F.2d 769, 774 (2nd Cir.1980) (stating "unfairness may inhere in some situations because the Government's grant of use

The dissent suggests that the jury was fully aware that Brown's and Mellisa's statements were replete with inconsistencies. The jury, however, never had the benefit of Brown's proffer. Whether the trial judge agreed with defense counsel's strategy or not, the defense wanted to show that the State accepted guilty pleas from two codefendants based on different operative facts. Defense counsels' chosen method for doing that would have shown the jury that Brown inculpated Linda directly, an admitted risk, but the defense's point would be that the State wanted Linda, and both Brown and Mellisa would say anything to avoid the death penalty.

The dissent creates the impression that the State took the ethical "high road" by not calling Brown (despite an apparent fog hindering earlier disclosure for more than six months) and that this maneuver did not harm Linda, because her defense counsel could have made whatever points they wished about Brown by the structurally limited crossexamination of Mellisa the trial judge did allow.[70] While we agree that neither side could have presented perjured testimony for its truth, the dissent fails to note that the defense could have used Brown's proffer for other purposes; i.e., impeachment—a fact the trial judge recognized. Ironically, the dissent finds no difficulty with the State introducing Mellisa's confessed perjured testimony.

We appreciate the dissent's thoughtful position, but believe the trial judge's rulings unfairly thwarted the defendant's constitutional right to present her case in the

way she and her counsel believed to be most effective.

### Conclusion

For these reasons, the judgment of the Superior Court is REVERSED. The case is REMANDED for a new trial consistent with this Opinion.

RIDGELY, Justice, dissenting.

I respectfully disagree that the plea agreement with Brown served as a representation of any kind to Linda Charbonneau. To be sure, it put Charbonneau on notice that Brown might be called as a witness, but there was no legal requirement for the prosecutors to call him to the witness stand or even to prosecute him.[71] Furthermore, with three co-defendants involved, there is nothing unusual about trying one before another who can still exercise his Fifth Amendment privilege. While the majority describes the prosecutors' choice not to call Brown as a witness as a "13th hour decision," the timing of that decision was relevant only to a defense application for a continuance of the trial, which was not made. The State did identify Brown as a *potential* witness in response to the trial judge's inquiry for purposes of preparing *voir dire* of the jury array, but the State had no obligation to disclose who would actually be called.[72] Neither did the defense.

I also disagree with the majority's assessment that the trial judge endorsed any fact or that he removed a critical credibili-

immunity to its witnesses affords it an advantage over the defendant's ability to present a defense. Secondly, to the extent that a trial is viewed as a search for the truth, denial of defense witness immunity may in some circumstances unfairly thwart that objective.").

**70.** *See Infra* pp. 53–57.

**71.** *Seth v. State*, 592 A.2d 436, 439 (Del.1991) ("In the exercise of his [or her] official powers, the Attorney General has discretion in determining who shall be prosecuted and in what manner that prosecution shall take place.").

**72.** *Liket v. State*, 719 A.2d 935, 937–938 (Del. 1998).

ty determination from the jury. The trial judge's statement that it would not be "natural" for the State to call Brown as a witness was made in the context of whether a missing witness instruction was required as a matter of law. This Court has held that policy considerations of the State's privilege to refuse to disclose the identity of an informant under D.R.E. 509 justified the State's failure to call an informant as a witness.[73] Here, the policy considerations which preclude prosecutors from offering testimony they know to be false justified their failure to call Brown as a witness as a matter of law.[74] Instead of removing a credibility determination from the jury, the trial judge allowed the credibility of the witnesses to be determined based upon fair cross-examination and evidence that would not be unfairly prejudicial to Linda Charbonneau.

· I· dissent from the majority's conclusion that "the trial judge's denial of the motion *in limine* fatally undermined the fairness of the trial."[75] To the contrary, the trial judge's ruling under DRE 403 that Brown's plea agreement and proffer was not admissible as substantive evidence was designed to protect Charbonneau's right to a fair trial. Brown's full proffer, which would not have been subject to cross-examination, inculpated Charbonneau directly in the murders. It specifically accused her of killing· John Charbonneau and of being an accomplice to the murder of Sproates. The trial judge's ruling under D.R.E. 403 was grounded upon precedent of this Court, which upheld the exclusion of a co-defendant's guilty plea to avoid unfair prejudice to the defendant on trial. In *Johnson v. State*[76] this Court said:

> The standard for admission of a codefendant's guilty plea is governed by Delaware Rule of Evidence 403, which states in part that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice..." D.R.E. 403. Determining whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice is a matter that falls particularly within the discretion of the Superior Court, which has the first-hand opportunity to evaluate relevant factors. *Lynch v. State*, Del.Supr., 588 A.2d 1138, 1141 (1991); *Williams v. State*, Del Supr., 494 A.2d 1237, 1241 (1985). The Superior Court has broad discretion to admit or reject evidence, and absent an abuse of that broad discretion, the Superior Court's ruling will be upheld by this Court. *Diaz v. State*, Del.Supr., 508 A.2d 861, 865 (1986).

> *Relying on precedents from other jurisdictions, the Superior Court concluded that, even though Johnson was arguing for the admission of Burgos' guilty plea, the prejudicial effect to Johnson of admitting the evidence substantially outweighed its probative value, especially since Burgos did not testify at trial.* (emphasis added). *See United States v. McLain*, 823 F.2d 1457, 1464–65 (11th Cir.1987) (holding that, in most cases, the admission of a codefendant's guilty plea will substantially affect the defen-

---

**73.** *Wheatley v. State*, 465 A.2d 1110, 1112 (Del.1983).

**74.** *See* DELAWARE LAWYERS RULES OF PROF'L CONDUCT, RULE 3.3 (A lawyer shall not knowingly offer evidence that the lawyer knows to be false.). While the prosecutors believed, based upon the investigation, that Brown would lie about Rucinski's in-

volvement in the Sproates killing, there was no representation that they knew Mellisa Rucinski would testify falsely.

**75.** *See supra* p. 4.

**76.** Del.Supr., 604 A.2d 417, 1991 Del. LEXIS 403 (Order).

dant's right to a fair trial because the jury may regard the issue of the defendant's guilt or innocence as settled); *State v. Parente*, 460 A.2d 430, 435 (R.I. 1983) (recognizing that "evidence of a codefendant's guilty plea is amenable to misuse"); *State v. Stefanelli*, 78 N.J. 418, 396 A.2d 1105, 1111–12 (1979) (same). The record in this case indicates that the Superior Court carefully considered arguments for and against the admission of Burgos' guilty plea. The record does not reflect that Superior Court abused its discretion in denying Johnson's request to introduce evidence of Burgos' guilty plea.[77]

If a co-defendant's guilty plea may be excluded under D.R.E. 403, after careful consideration, so also may a proffer of the co-defendant which he made in conjunction with that guilty plea, provided its probative value is substantially outweighed by the danger of unfair prejudice.

While the majority reverses the convictions because of the impeachment value of Brown's plea agreement and proffer, the record shows that the trial judge left the door open for the use of Brown's proffer in the cross-examination of Mellisa Rucinski. A trial judge is not required to make evidentiary rulings in advance of trial but rather, in his discretion, may defer a ruling on an evidentiary issue until the evidence is actually offered.[78] Here the trial judge said:

> *The scope, depth, and limitations of cross-examination of Mellisa Rucinski will be determined at the time she is called to the stand,* and the defense will have to show the connection of bias, interest and prejudice between whatever Brown said or accused in Rucinski's testimony, and I will make a decision at that time on those points.[79]

During cross-examination of Mellisa Rucinski the defense did not seek to introduce Brown's plea agreement or proffer.[80] The record does not reveal why. Perhaps they recognized a better alternative.[81] In any event, the defense successfully executed their strategy the majority says the trial judge prevented. The defense proved through the intrinsic evidence of Rucinski's own testimony and her writings that she and Brown could not agree on the details of their own involvement in the murders. Rucinski wrote six pages of comments disputing Brown's proffer. She was cross-examined about her comments and her writing was introduced as a defense exhibit during that cross-examination.[82] She acknowledged that she went through what Brown said in detail and that

---

**77.** *Id.*

**78.** *Dawson v. State*, 581 A.2d 1078, 1087 (Del. 1990).

**79.** A–156. (emphasis added).

**80.** The cross-examination and re-cross-examination of Mellisa Rucinski is reported in 128 pages of transcript. A–281 to A–401 and A–442 to A–450. There were two objections by the State relating to Brown's proffer. The first objection was withdrawn when the prosecutor realized defense counsel was not offering Brown's proffer but Mellisa's comments on Brown's proffer into evidence. A–321. The second objection by the State was overruled when defense counsel questioned Melli-

sa Rucinski about Brown's claim that Rucinski was with him when Sproates was killed. A–442.

**81.** If the State had introduced Brown's plea agreement and proffer, a reversal of Charbonneau's conviction would be required. *See Allen v. State*, 878 A.2d 447 (Del.2005). The challenges to defense counsel of defending during a post-conviction relief proceeding a tactic of introducing inculpatory evidence that the jury could use to convict their own client is self-evident.

**82.** DX–2.

he did not tell the truth.[83] Brown's accusation of her involvement in the Sproates murder was the subject of direct inquiry by the defense over the objection of the State:

> Q. In fact, he [Brown] said you were in Magnolia with him when Billy Sproates was killed?
>
> MS. RYAN: Objection
>
> THE COURT: Overruled.
>
> You can answer that question.
>
> BY MR. KARSNITZ:
>
> Q. That's what he said?
>
> A. Yes.
>
> Q. Apparently, he didn't take your advice to tell the truth?
>
> A. No.[84]

Not only did defense counsel elicit testimony from Rucinski that Brown had lied, he skillfully obtained her admission that she had lied all four times she had an opportunity to speak about the case.[85] Defense counsel had the opportunity to do what they told the trial judge they wanted to do, namely "to use *certain statements* made in the plea and proffer to test Ms. Rucinski's possible bias and credibility."[86] It is undisputed that the defense was not "seeking to have Mr. Brown's plea and proffer admitted to show the truth of what is said therein."[87] Since defense counsel carefully selected the portions of Brown's proffer that they wanted to use in cross-examining Rucinski, I find no abuse of discretion in keeping the balance of Brown's proffer from the jury's consideration. Given the cross-examination which happened, the probative value of the proffer to further show Mellisa's bias was slight and the potential unfair prejudice to Linda Charbonneau was real. The record shows that the jury was fully aware that Brown and Rucinski's statements were replete with inconsistencies and that Brown accused Rucinski of being involved in the Sproates killing. The foundation for an argument that Rucinski had a motive to lie because of Brown's accusation was in front of the jury. What the jury did not know, because of the trial judge's ruling, is that Brown accused Linda Charbonneau of killing John Charbonneau.

The trial judge carefully balanced the probative value of admitting the plea agreement and written proffer against the danger of unfair prejudice to Linda Charbonneau. Ultimately, the trial judge permitted the defense to cross examine Rucinski, as they wanted, on the portions of Brown's proffer they selected. I cannot say that the trial judge's decision to exclude the balance of Brown's plea and proffer under these circumstances exceeded the bounds of reason. Because the trial judge's choices were matters within his broad discretion, I find no reversible error.

I respectfully dissent.

---

83. A–442.

84. A–442.

85. A–362. Although damaging, this evidence did not preclude the jury from accepting Rucinski's trial testimony about Linda Charbonneau's involvement as an accomplice.

86. A–125. (emphasis added).

87. *Id.*