IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LAMAR IVERSON, | § | |
| | § | |
| Defendant-Below | § | No. 345, 2023 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID Nos. 2110002829, |
| STATE OF DELAWARE, | § | 2110003116, 2301009927, |
| | § | 2110000159, 2011011660, |
| Appellee. | § | 2011011490, 2106004260 |

Submitted: August 14, 2024
Decided: September 4, 2024

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 4th day of September, 2024, after careful consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)    Lamar Iverson was convicted in the Superior Court of 18 offenses: third-degree assault, first-degree burglary, stalking, endangering the welfare of a child (three counts), harassment (two counts), terroristic threatening, resisting arrest, non-compliance with bond conditions (seven counts), and criminal mischief.  He was sentenced to 57 years of Level V incarceration, followed by probationary supervision.

(2) Iverson's convictions stem from incidents involving Ashley Todd, his on-again, off-again girlfriend, and her three minor children.

(3) In the months leading up to October 7, 2021, Iverson called Todd, sent her text messages, and visited her home, workplace, and grandparents' home, all while under court orders to have no contact with either Todd or her children. In the early hours of October 7, Todd armed herself with pepper spray and a knife after she received messages from Iverson, including this one at 3:00 a.m.: "Where you at? I'm coming to come to your house, and you will see what the outcome is."[1] At about this time, Iverson entered the second story of Todd's home through a window. Awakened by her dog's barking, Todd was on the line with 911 when Iverson confronted her. He punched her in the face. A struggle ensued, and Todd screamed for her children. When Iverson went downstairs, the children helped a bloodied Todd barricade her bedroom door. Iverson came back and tried to force himself in, eventually giving up and taking Todd's phone. Upon the arrival of the police, the family identified Iverson as the assailant. He was arrested later that day.

(4) On November 15, a court again ordered that Iverson have no contact with Todd. But according to prison recordings, he began contacting her three days later and continued to do so over a period of nearly 14 months through hundreds of calls, video chats, and messages. For example, Iverson asked Todd, and she agreed,

_____

[1] App. to Opening Br. at A133.

2

to make copies of an affidavit addressed to the Department of Justice ("DOJ") in which she would state that she did not want to press charges; the record does not disclose whether Todd drafted and submitted this affidavit to the DOJ. Iverson later enlisted his mother, his son, and a contact named J-Hood to communicate with Todd or persuade her to act on his case. Leading up to the February 2023 trial, Iverson told his mother to instruct Todd that, if she were to be subpoenaed, she would not have to comply. Iverson also told Todd that, if complaining witnesses did not appear for trial, then the State would have to throw out the case; that "if she comes to trial and he loses[,] he will get 19 years[,]" so she should speak on his behalf; and "that the State is brainwashing her."[2] Iverson revealed to his mother that he was "relying on Todd not coming to court."[3]

(5)    During the same nearly 14-month period, the DOJ sought Todd's cooperation and participation as a trial witness. Early on, the DOJ failed in its two attempts to reach Todd. When a victims' services social worker employed by the DOJ did reach her, Todd shared that she did not want to testify against Iverson. The social worker reached out again in February 2022. Todd confirmed her unwillingness to testify and stated that Iverson did not need to be jailed. But by June, Todd revealed that she was willing to cooperate with the DOJ and that she

---

[2] *Id.* at A82–83.
[3] *Id.* at A83.

3

would testify. The social worker spoke with Todd at least three more times to confirm her willingness to cooperate. Todd attended her first trial preparation meeting on January 18, 2023. Another one was scheduled for two weeks later.

(6) At a January 30 status conference, the State reported that it was planning to have Todd testify. Defense counsel represented that Iverson's trial strategy was that Todd would not appear for trial, and counsel asked whether the State would issue a material-witness warrant "or something along those lines[.]"[4] The State did not mention a material-witness warrant but replied that, if Todd did not appear, then it would move under an exception to the hearsay rule to admit her prior out-of-court statements.

(7) After that, Todd missed a February 1 trial preparation meeting, and the State could not reach her by phone. The State sent an investigator to Todd's home to follow up, and Todd responded that she "'forgot'" about the meeting.[5]

(8) On February 3, the State moved *in limine* for leave to introduce Todd's and her children's statements during the impending trial under Delaware Rules of Evidence ("D.R.E.") 804(b)(6), the forfeiture-by-wrongdoing hearsay exception. The motion provided a detailed description of Iverson's prison communications with Todd and the State's efforts to secure her participation. When referring to the

---

[4] *Id.* at A63.
[5] *Id.* at A85.

February 1 meeting in the motion, the State noted, without detail, that a letter and subpoena issued to Todd "was returned."[6]

(9)    Sometime after 9:51 a.m. on February 6—the first day of trial—the court requested Iverson's position on the motion, and, predictably, he opposed it. Again, counsel alluded to the availability of a material-witness warrant. The State disclosed that, although Todd attended the final trial preparation meeting on February 3, it was unclear whether "she's going to show today. Her reporting time was ten o'clock, I've not gotten word that she's here yet."[7] Without elaborating, the court stated that it was "convinced the high bar has been met" and granted the motion.[8]

(10)    Before the jury was seated, Iverson rejected a plea offer. By then, it was just before noon. The State reported that Todd had not appeared and that it therefore intended to proceed with the admission of her prior statements. The court then clarified its reasons for allowing Todd's out-of-court statements to be admitted under D.R.E. 804(b)(6):

> So the Court has granted the State's motion in limine, and I just want to talk a little bit about that . . . . I just want to recount for the defense['s] benefit that out-of-court statements used to prove the truth of the matter asserted are not admissible unless allowed by an exception. And pursuant to DRE 804(b)(6), [a]n otherwise inadmissible hearsay statement may be offered against a party that is engaged in or

---

[6] *Id.*
[7] *Id.* at A97.
[8] *Id.* at A98.

acquiesced in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness.

This rule codifies an equitable doctrine long recognized by the Supreme Court of the U.S. and by many state and federal courts that a party has no right to profit from intentionally undermining the truth-seeking process by attempting to prevent a witness from testifying against him . . . .

And the State bears the burden . . . to prove by a preponderance of the evidence that such conduct occurred that justifies forfeiture of the right to confront witnesses when the defendant has procured their absence from trial.

The Court as a preliminary matter has to find that the State has established that—which I have, for all the reasons mentioned, and for all the, of the State's evidence set forth in the motion itself detailing the acts of the defendant and the fact that the complaining witness did not show today for trial.

The plain language of the rule requires that the State[,] [a]s the proponent of a prior out-of-court statement sought to be introduced at trial prove[,] the following:  A) [t]hat the witness is unavailable; B) [t]hat the defendant acted wrongfully or acquiesced in wrongful acts that resulted in the witness's unavailability at trial, and C) [t]hose acts were intended to result in the witness's unavailability at trial.  The Court should determine whether or not the State can meet that burden as a preliminary question of admissibility.  And I have already ruled that [it has].[9]

This ruling permitted the State to introduce into evidence over half a dozen 911 audio recordings and police body-camera footage, including recordings taken before and during the October 7 attack, and footage recorded after the attack.

---

[9] *See id.* at A113–14.

(11)    At the conclusion of the evidence, the court instructed the jury, and part of the instruction on the crime of stalking defined "course of conduct" to mean "repeatedly maintaining a visual or physical proximity to a person, repeatedly conveying verbal or written threats, or threats implied by conduct, or repeatedly committing acts constituting any criminal offense."[10]  The jury convicted Iverson of 18 of his 22 charges.

(12)    Iverson raises three arguments, which we will take up in turn.  First, he insists that the court plainly erred by instructing the jury on the crime of stalking in reliance on outdated statutory language and correspondingly outdated "pattern" instructions.  The stalking statute,[11] which required the State to prove, in part, that Iverson engaged in a "course of conduct" directed at Todd, defines that term to mean "3 or more separate incidents, including, but not limited to, acts in which the person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveys, threatens, or communicates to or about another, or interferes with, jeopardizes, damages, or disrupts another's daily activities, property, employment, business, career, education, or medical care."[12]  But here the Superior Court instructed the jury that "course of conduct" is defined

---

[10] *Id.* at A171.
[11] 11 *Del. C.* § 1312.
[12] 11 *Del. C.* § 1312(e)(1).

7

as "repeatedly[,]" which, Iverson argues, can mean *fewer* than "3 or more separate incidents[.]"

(13)   Iverson did not object to the instruction, and we therefore review it for plain error.[13]  "To reverse for plain error, 'the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.'"[14]  For jury instructions to constitute plain error, it has to be likely that they "'affected the outcome of the trial[,]'"[15] for example, because they created unreasonable confusion.[16]

(14)   The instruction was in fact erroneous; it tracked nearly identical language from an outdated pattern jury instruction[17] derived from the older version of the statute.[18]  But Iverson cannot show that the inexact instruction affected the outcome of his trial.  The jury's verdicts themselves—unanimous findings of guilt on charges of assault, burglary, criminal mischief, harassment, non-compliance with bond conditions, and terroristic threatening, in all of which Todd was the victim— demonstrate that the result would necessarily have been the same had the court used

---

[13] Opening Br. at 10.
[14] *Hastings v. State*, 289 A.3d 1264, 1270 (Del. 2023) (citation omitted).
[15] *See id.* at 1271–72 (citation omitted).  *See also Mills v. State*, 732 A.2d 845, 849 (Del. 1999); *Morgan v. State*, 962 A.2d 248, 254 (Del. 2008).
[16] *Probst v. State*, 547 A.2d 114, 120 (Del. 1988); *Taylor v. State*, 464 A.2d 897, 898–99 (Del. 1983).  *See also Ray v. State*, 280 A.3d 627, 643–46 (Del. 2022).
[17] "Stalking," Criminal Pattern Jury Instructions of the Superior Court of the State of Delaware (available at pattern_criminal_jury_rev5_2022a.pdf (delaware.gov) (p. 1150 of 1533) (last updated through 77 De. Laws June 30, 2010) (last accessed Aug. 21, 2024).
[18] *See* 11 *Del. C.* § 1312A(b)(1) (eff. until Oct. 13, 2008).

the updated definition of "course of conduct" in its instruction. Put differently, it is clear that the jury found Iverson guilty of "3 or more separate incidents[,]" which meets the definition of "course of conduct" under the current version of the stalking statute. Thus, had the jury been properly instructed, the result of Iverson's trial would have been no different.

(15) Second, Iverson claims that the court plainly erred—he admits again that he failed to raise this issue to the Superior Court[19]—when it failed to give a specific-unanimity instruction for the stalking and burglary charges. He argues that, because there were up to "364 distinct combinations of three incidents" for the jury to choose from on the stalking charge, the odds of it agreeing on "three separate qualifying incidents"—absent a specific-unanimity instruction—may have been "effectively zero."[20] The flawed "course of conduct" definition, Iverson contends, exacerbated this problem. As for the burglary charge, the indictment alleged in "and/or" terms that Iverson intended to commit up to four distinct crimes in Todd's home: assault, non-compliance with bond conditions, theft, and criminal mischief. Maintaining that the State proffered evidence on all these "'conceptually different'" theories, Iverson claims that the "[f]ailure to give a specific-unanimity instruction

---

[19] Opening Br. at 12.
[20] *Id.* at 14.

9

prevent[ed the] jury from finding each element was proved beyond a reasonable doubt."[21]

(16) A specific-unanimity instruction "'indicates to the jury that they must be unanimous as to which specific act constitutes the offense charged.'"[22] But specific-unanimity instructions are only required "when 'there are factors in a case which create the potential that the jury will be confused.'"[23]

(17) We are hard pressed to see how the jury was confused on either count or how a specific-unanimity instruction likely would have resulted in a different outcome. As to the stalking charge, simply because there were numerous "separate qualifying incidents" that could have sustained a conviction does not mean that the State advanced alternative or multiple theories of liability, which would have been required for a specific-unanimity stalking instruction to apply.[24] And as to the burglary charge, Iverson does not dispute the instruction, which required the jury to find, in part, that Iverson "intended to commit *a* crime in the dwelling[.]"[25] Of the four crimes the indictment listed as possible theories for liability, the jury convicted Iverson of all but theft. This leads us to conclude that the jury was not likely confused, as any one of these three convictions—and the jury was unanimous as to

---

[21] *Id.* at 15–16.
[22] *Jones v. State*, 227 A.3d 1097, 2020 WL 1845887, at *5 (Del. Apr. 13, 2020) (TABLE) (citation omitted).
[23] *Id.* (citation omitted).
[24] *Id.*
[25] App. to Opening Br. at A174 (emphasis added).

10

all of them—may have served as the predicate to a burglary conviction. Thus, we find no plain error.

(18) Iverson's third argument is that the court erred by granting the motion for forfeiture by wrongdoing under D.R.E. 804(b)(6). The parties dispute how this ruling should be reviewed. Iverson acknowledges that our precedents have previously applied abuse-of-discretion review to such questions, but he claims that, because the rule also implicates constitutional confrontation rights, the standard of review should be *de novo* in line with how other jurisdictions treat the question. But in *Phillips v. State*, we adopted the United States Supreme Court's reasoning that "'one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation'" and, after explaining the rule, we underscored that "[i]n Delaware, a trial judge's ruling under this doctrine is reviewed for an abuse of discretion."[26]

(19) The burden of proof here is a preponderance of the evidence.[27] First, a proponent must show that the declarant is "absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means to procure the declarant's attendance."[28] Second, a proponent must show that a "party

---

[26] *See* 154 A.3d 1130, 1143 (Del. 2017) (citation omitted). This case does not stand alone. *Miller v. State*, 270 A.3d 259, 271 (Del. 2022) and *Charbonneau v. State*, 904 A.2d 295, 317 (Del. 2006) expressly state that rulings under D.R.E. 804(b)(6) are reviewed for an abuse of discretion.
[27] *State v. Miller*, 2020 WL 4355557, at *8 (Del. Super. Ct. 2020).
[28] D.R.E. 804(a)(5).

11

has 'engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.'"[29]

(20)   Iverson does not dispute that his prison communications related to Todd's participation in the upcoming trial; rather, he focuses on the unavailability requirement and urges us to follow other jurisdictions that "strictly enforce[]" it to protect confrontation rights.[30]   In Iverson's view, the State's attempt to subpoena Todd and its failure to take action to locate her on the first day of trial fell short of what is required under this standard.   Iverson claims that the State's failure to issue a material-witness warrant "cannot be squared" with the "good-faith, genuine, and bona fide effort to procure the declarant's attendance" that is required under our decision in *Moss v. State*.[31]

(21)   We disagree.   The State only elicited a commitment to testify from Todd—who had hitherto been unwilling—after she confirmed her willingness to the social worker at least three times.   That the State attempted to subpoena Todd, called her, and sent an investigator to her home when she missed a trial preparation meeting because she "forgot" about it just days before trial amount to a "good-faith, genuine, and bona fide effort" to procure her attendance.   We are not, nor was the Superior

---

[29] *Miller*, 270 A.3d at 271 (citing D.R.E. 804(b)(6)).
[30] Opening Br. at 19.  *See also* Reply Br. at 8.
[31] *See* 166 A.3d 937, 2017 WL 2806269, at *4 (Del. June 28, 2017) (TABLE).  *See also* Reply Br. at 13.

12

Court, constrained to limit our analysis to the State's actions or inactions on the morning of the first day of trial and to discount the State's months-long efforts before that, as Iverson implores us to do. D.R.E. 804(a)(5) required the State to show it had undertaken "*reasonable* means to procure" her attendance,[32] and the State met its burden. A material-witness warrant was unnecessary. The court did not abuse its discretion in finding Todd unavailable, or when it found that Iverson's prison communications with or about Todd were adequate grounds for concluding that he intended to and did effect Todd's unavailability. It follows that the Superior Court did not abuse its discretion by granting the motion to admit Todd's out-of-court statements.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[32] D.R.E. 804(a)(5) (emphasis added).

13